[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I
This action is based upon a second amended complaint filed by Fireman's Fund Insurance Company (Fireman's Fund) on May 18, 1989. This complaint was brought in two counts but the second count was dismissed by the court. The remaining count is brought pursuant to Conn. Gen. Stat. § 4-61(a) providing for an action against the state in the event of a disputed claim under a construction contract with the state.
A.
CT Page 4461
The complaint alleges that on or about January 26, 1984 the State of Connecticut acting through the Department of Public Works (DPW) entered into a contract (the Contract) with Leslie and Elliott Company (L E) for construction of certain specialized group homes (the Project) to be built at various locations within the State of Connecticut. The contract was the consequence of a consent decree requiring the State to provide community residential housing for mentally retarded citizens.
The plaintiff further alleges that Fireman's Fund issued a Performance Bond and a Labor and Materials Bond for completion of the Project which was incorporated into and was an essential part of the Contract.
Fireman's Fund alleges that the State, prior to award of the Contract, did not coordinate its utilities designs with local authorities causing problems for L E in securing permits which disrupted construction and caused delays in performance; that the State did not adequately assist L E in its attempts to overcome these problems; that L E encountered adverse field conditions at several worksites not noted on construction plans which resulted in disruption of construction and further delays; that by letter dated August 13, 1985 DPW terminated the right of L E to perform further work on the Contract and that DPW's termination was unreasonable and unjustified.
Fireman's Fund alleges also that on December 10, 1985 DPW made demand upon it to complete the work representing to it that L E had been terminated because L E had breached the Contract; that Fireman's Fund entered into an agreement (the Agreement) dated March 3, 1986 for completion of the Project which agreement Fireman's Fund maintains expressly incorporated the Contract and all Contract documents, including the drawings, specifications, general conditions and special conditions of the Contract; that Fireman's Fund completed the Project which was accepted by DPW on May 10, 1988 and for which a Certificate of Completion and Acceptance was issued on July 29, 1988.
Fireman's Fund alleges that it has incurred damages in excess of $1,200,000 as a result of the termination of L E; that the termination was unreasonable and unjustified and constituted a breach of the contract by DPW which has and will cause Fireman's Fund substantial loss and damage.
B.
CT Page 4462
DPW filed an answer March 31, 1991, containing five special defenses and a counterclaim. The first two special defenses deal with reduction in damages to avoid or prevent any double recovery to Fireman's Fund. The other special defenses are accord and satisfaction, waiver and estoppel.
 C.
The counterclaim is brought in four counts seeking recovery on the basis of negligent misrepresentation, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and violation of the Connecticut Unfair Trade Practices Act, CGS § 42-110a (CUTPA).
 D.
Plaintiff filed a reply to the special defenses denying the allegations in each of the special defenses and then filed an answer to the counterclaim, which answer contains eight special defenses.
The first special defense pertaining only to Count One states that assuming that plaintiff made any of the representations specified in that count and the defendant relied on any of these, such reliance was not justifiable.
In the second special defense, which pertains only to Count Two, the plaintiff alleges that if any negligent misrepresentations were made, the defendant was contributorily negligent in relying on any of them.
As to the third special defense, which pertains only to Count Two, the plaintiff maintains that if there were any misrepresentations, and if the defendant relied on any such misrepresentations such reliance was not justifiable.
As to the fourth special defense, which pertains only to Count Three, the plaintiff alleges that it was not under any legal duty to make the representations contemplated in this count.
The fifth special defense which pertains only to Count Four, states that a surety is not a fiduciary of its obligee. CT Page 4463
In the sixth special defense, which pertains only to Count four, the plaintiff alleges that it was not under any legal duty to make the representations contemplated in Count Four.
The seventh special defense pertains only to Count Five in which plaintiff maintains that assuming arguendo that it has engaged in any of the acts alleged in Count Five and assuming that any of these acts constitute a violation of the Connecticut Unfair Insurance Practices Act (CUIPA), plaintiff has not engaged in any of these violations with sufficient frequency to indicate a general business practice of engaging in such conduct.
The eighth special defense pertains to all counts and is to the effect that if the defendant is entitled to a judgment as to any other counterclaims, the defendant has failed to mitigate its damages.
 II
The parties have entered into a joint stipulation of facts which is incorporated into the recitation of facts hereinafter set forth by the court
The plaintiff, Fireman's Fund, is a California corporation with its principal place of business in SanRafael, California. The defendant, Department of Public Works of the State of Connecticut, is an agency of the State of Connecticut in charge of construction and maintenance of public works of the State.
In 1978 the Connecticut Association of Retarded Citizens (CARC) commenced a class action lawsuit in United States District Court challenging the patient treatment and living conditions maintained by the Connecticut Department of Mental Retardation (DMR) at its primary residential facility, Mansfield Training School. In late 1983 the parties in the CARC v. Thorne lawsuit entered into a consent decree whereby the DMR agreed to make available suitable services and facilities to provide an opportunity for DMR patients to live in a community residential setting.
The DMR arrived at a plan for community placement whereby it would build "Group Homes" at various locations around the state. Working with architects, the DMR issued plans and specifications for community-based residential modular group homes. In December 1983 the State solicited competitive bids to build and install CT Page 4464 eight modular houses on six sites. The six sites were in Manchester, Groton, Danielson, Waterford, Newington and Windsor. (Two houses were to be built on the sites in Danielson and Windsor).
The low bidder was a contractor named Leslie and Elliott Company (L E). On January 26, 1984 the contract was awarded to L E for a total contract price of One Million Six Hundred and Ninety-Five Thousand Dollars. Fireman's Fund provided performance and payment bonds for the project. Under the terms of the performance bond Fireman's Fund pledged to indemnify the State in the event that L E failed to properly perform the bonded contract. By virtue of the payment bond Fireman's Fund agreed to guarantee L E's payment of sums owed to its subcontractors, laborers and vendors for material provided and work performed in relation to the project. As a condition for issuance of the bonds L E and its principals (referred to collectively as "the indemnitors") had executed an indemnity agreement (hereinafter "the indemnity agreement") in favor of Fireman's Fund in which they had agreed to indemnify Fireman's Fund for any losses incurred as a consequence of Fireman's Fund issuing bonds to L E.
The contract specified a completion date of July 30, 1984 and liquidated damages of $250 per day in the event that the contractor could not complete by June 30, 1984.
L E had a large factory building in Dayville, Connecticut. It planned to fabricate the modular units at its Dayville facility, then move them to the various sites throughout the state. After the modular units were installed on each site, L E would complete the interior and exterior finish work and all site work necessary to make the homes suitable for occupancy.
Contract work commenced in March of 1984. However, the project was plagued by delays, disputes, stop work orders and termination notices. There was evidence that the contracting parties share responsibility for the problems. The planning process which the State would normally complete prior to letting a contract of this scope had been attenuated due to the time pressures caused by the need to comply with the consent decree. This resulted in some deficiencies in the State's preparations for construction, such as the failure to provide adequate base lines at the construction sites and failure by the State to coordinate its design of the utilities with local authorities prior to the bidding process so that the contractor would be CT Page 4465 readily able to obtain the necessary permits. As a result L E encountered problems in obtaining permits from local authorities in some cases which delayed and disrupted the performance of its site work.
L E had no prior experience in building modular homes. Some of L E's work was of poor quality. In some cases there was poor workmanship and a failure to supervise its subcontractors. In other instances L E unilaterally changed the design specifications or installed materials that were of lesser quality than those required by the specifications in order to reduce its costs, such as modifying the electrical wiring requirements in the specifications and unilaterally using exterior siding not specified in the contract. L E did not develop an organizational plan that would have made it possible for completion of the project within the six month period contemplated by the contract.
During the period between April 1984 and October 1984 one or both of the parties contacted Fireman's Fund on a number of occasions to complain about the conduct of the other party. A representative of Fireman's Fund attended meetings involving the parties during this period. Fireman's Fund attempted to play the role of a mediator and facilitator.
The contract completion date had already passed when the first modular unit was moved from the Dayville plant to the Danielson site on July 17, 1984. This was followed a week later by a second unit, also moved to the Danielson site. Approximately a month later another modular unit was moved to the Groton site. Finally, in February 1985 a fourth modular unit was moved to the Manchester site.
As of April 1985, nine months after the contract completion date, none of the units had been completed. Four modular units had been set on foundations at three sites, but the finishing work had not been completed. At the Newington and Waterford sites only, the foundations had been poured. At the Windsor site a small amount of site clearing had been done but nothing else. The construction materials for the four modular homes that were to be placed at the Windsor, Newington and Waterford sites were stacked up at L E's Dayville plant. L E had not started to build them.
On April 10, 1985 the State issued a notice terminating L E effective April 17, 1985. A copy of the letter was sent to and CT Page 4466 received by Michael Dotsey, a Fireman's Fund employee overseeing this bond. After April 17 several meetings were held to discuss the status of the project, including discussions between officials of the DPW and representatives of L E about a proposal to renew construction activities along modified lines.
On July 1, 1985, as a result of these meetings, the DPW issued a letter rescinding the April 10, 1985 termination letter. The letter requested that L E submit within six days a schedule for completion of the four homes already on site and that L E countersign and return the letter indicating agreement to a deductive change order, removing the other four homes from the contact. L E did not resume construction, did not countersign the letter and did not supply a revised construction schedule. There were no workers on any of the construction sites in the month of July. The work was at a standstill and deteriorating. On August 13, 1985 the State issued a notice of termination stating that "there had been no activity at the job site nor any response to our letter."
On August 29, 1985 the State sent a copy of the termination letter to Fireman's Fund and requested Fireman's Fund's assistance to complete the project. Fireman's Fund responded to the State's letter of August 29, 1985 in a letter dated September 9, 1985. In said letter Fireman's Fund noted that there was a serious question as to which party was responsible for the termination. The letter stated,
 "Without passing judgment on anyones [sic] actions in this matter, it would seem most expeditious that the parties could amicably resolve their differences, reduce a method for completion to writing and get the show on the road. If this office can be of any held in reaching such a solution, we shall as in the past do anything we can to help."
The State did not respond to plaintiff's September 9 letter. There is no record of any communication between Fireman's Fund and the State from September 9, 1984 until November 21, 1985.
Between September 9, 1985 and November 21, 1985 the State unilaterally attempted to separately rebid the four units/three sites. There were no bidders for the work at the Groton and Danielson sites. Two bids were received for the Manchester site but the State decided that these bids were unacceptable. CT Page 4467
On November 21, 1985 Fred Palmer, the project coordinator for DPW, called Fireman's Fund. This call lead to discussions with Allison Herman of Fireman's Fund on November 21 and 22 concerning the bonding company's responsibility to complete the construction of the project. She stated that they would discuss the matter with L E and the contractor's attorney.
Fireman's Fund almost immediately hired construction consultants to evaluate the status of the construction.
These discussions led to a December 6, 1985 meeting attended by representatives of DPW, L E and Fireman's Fund. This meeting was held at the State Office Building to discuss the present status of the project. Representatives of L E made it quite clear at the December 6 meeting that they would not return to the job.
Mr. Tanner of Fireman's Fund stated at this meeting that he would return to Hartford next week if the bonding company receives a letter requesting that they complete the project as required by the January 26th contract and they also agreed to provide a decision as rapidly as possible as to what the bonding company proposes to do. In a letter dated December 9, 1985 to Allison Herman of Fireman's Fund, summarizing the December 6th meeting, Mr. Palmer states "the DAS/DPW's files are available at this office for you to go through and we will be glad to provide copies of any important information you request. If you have any questions, please do not hesitate to call."
On December 10, 1985 Donald Cassin, Deputy Commissioner, sent a letter to Fireman's Fund stating:
 "In answer to questions raised at the meeting held on Friday, December 6, 1985, the State of Connecticut is looking to your Fireman's Fund [sic] to fulfill its obligations under its performance bond. In this regard, we are requesting that your company complete the project in its entirety. It is to be noted that of the eight (8) modular homes to be completed, four (4) are presently at a stage of substantial completion. We hope that you will be able to complete these four by January 31, 1986." CT Page 4468
After the meeting of December 6, Mr. Minogue, Vice President of L E, informed Mr. Tanner of Fireman's Fund that L E would sue Fireman's Fund if it acted in a manner detrimental to L E.
The consultants retained by Fireman's Fund to investigate the facts regarding the termination were the Philadelphia accounting firm of Laventhal and Horwath. Laventhal and Horwath in turn hired a New Jersey firm named Fidelity Surety Investigation (FSI). Soon after December 10 the Surety's consultants began inspecting the job sites. Later in December Fireman's Fund retained Attorney Penrose Wolf to oversee its investigation, formulate a response to the State's claim and negotiate with the State.
On the basis of its investigation Fireman's Fund concluded that the termination was "probably proper," and Fireman's Fund entered into negotiations with the State regarding taking over the project. Attorney Penrose Wolf represented Fireman's Fund in all future negotiations. The Surety's representatives met with the State on January 8, 1986. The State demanded that the Surety complete construction by January 31, 1986. The Surety advised that this demand was impossible. By the end of the meeting the parties agreed that the Surety would complete its investigation and report to the State by the end of January. Immediately following this meeting the State released it job file to Fireman's Fund.
During the intervening period Fireman's Fund attempted to meet with L E to review its files and ascertain its explanation for the termination. L E was uncooperative and refused to allow Fireman's Fund to copy its files.
Both the State and Fireman's Fund were aware that the propriety of the State's termination decision was not free from doubt. The negotiations between the State and Fireman's Fund culminated in a January 28, 1986 meeting between representatives of the State and representatives of Fireman's Fund in which the Surety offered to complete the four units/three sites in exchange for the undisbursed contract funds relating to these sites, a waiver of liquidated damages, a release by the State running in favor of the Surety for any other claims and completion of the work in 14 weeks.
At this point the State of Connecticut had demanded in its letter to Fireman's Fund that the contract be completed in its CT Page 4469 entirety and that the four units that were in a substantial stage of completion be completed by January 31, 1986.
Fireman's Fund had investigated the work under the contract and had come to the conclusion that much of L E's work was of poor quality and they were also aware of L E's allegations regarding the State's administration of the bonded contract and that there was some support for these allegations, and there was a dispute between the State and Fireman's Fund re the scope of the work necessary to complete the project under the State/L E contract.
Fireman's Fund was of the opinion that the proposal which it made at this January 28 meeting was, out of all the options available to it, the one that resulted in the smallest loss to the Surety in the performance of its obligations under the bonded contract.
After brief consideration of the proposal, the State accepted same with certain modifications, including the demand that the Groton site be completed in ten weeks from the start of construction. This proposal made on January 28, 1986 by Fireman's Fund was to ultimately lead to a written agreement which was entered into between the State and Fireman's Fund on March 3, 1986 (the Agreement).
On February 10, 1986, while this Agreement was being negotiated, L E filed a suit in Superior Court alleging that the State had wrongfully terminated L E and seeking inter alia
damages for the wrongful termination and an order enjoining Fireman's Fund from completing the project.
During the negotiations for the Agreement there was no specific demand by the State that Fireman's Fund release it from liability as a condition of settling its claim on the performance bond, nor was there any specific discussion of Fireman's Fund's right to sue for wrongful termination in the event that it was determined that L E had been wrongfully terminated. The Agreement provides that after completion of the work called for under it the State would release Fireman's Fund from any further liability in regard to the project.
On March 12, 1986 the plaintiff entered into a contract with Drill Construction Company, Inc., to perform the work defined in the Agreement. This contract called for commencement of the work CT Page 4470 no later than February 25, 1986 with substantial completion not later than June 1, 1986 and final completion no later than June 30, 1986 and further for beneficial occupancy of the house at the Groton site by May 1, 1986 and beneficial occupancy of the houses at the Manchester and Danielson sites by May 30, 1986.
After the completion work had begun it was determined that a substantial amount of L E's work that had been approved by the State was in fact unacceptable. Fireman's Fund was obligated under the terms of the Agreement to correct this work and as a consequence was unable to complete the job within the time frame provided. The costs incurred by Fireman's Fund were in excess of what it had contemplated and as a result Fireman's Fund submitted a claim to the State in the amount of Forty-eight Thousand Seven Hundred and Fifty-seven Dollars. The State granted the claim in the amount of Thirty-nine Thousand Eight Hundred and Fifty-two Dollars and Sixty-three Cents. No units were completed under the original contract deadline and no units were completed under the March 3rd Agreement deadline. Fireman's Fund finally did complete the work, however, and eventually the four group homes were completed and both sides fully performed their obligations under the March 3rd, 1986 State/Fireman's Fund Agreement.
Fireman's Fund brought suit against L E in U.S. District Court on February 14, 1986 and demanded that L E pay Fireman's Fund for "any and all claims, demands, losses, costs, damages, fees of attorneys, and other expenses incurred by plaintiff in consequence of the surety bond." The claim is based upon the written indemnity agreement between Fireman's Fund and Leslie and Elliott and its principals.
On March 11, 1986, in its suit against DPW, L E demanded arbitration with the State claiming a breach of the January 26, 1984 construction contract, monetary damages "resulting from the State of Connecticut's improper termination for default and other breaches of contract." Fireman's Fund received a copy of this arbitration demand but did not appear. Hearings were held in October of 1987 and the arbitration panel rendered its decision on March 28, 1988, making a finding of fact that the termination of L E by the State was "wrongful and unjustified" and that L 
E was damaged by the action of the State in the amount of Three Hundred and Fourteen Thousand Five Hundred and Sixteen Dollars.
Fireman's Fund, acting through Penrose Wolf, intended to reactivate the indemnity suit in federal court against L E and CT Page 4471 attach the amount due L E from the State. However, Mr. George Thomas, a surety counsel for Fireman's Fund working out of the home office in California and acting through Michael Jankowski, a surety claims supervisor in Philadelphia devised a scheme to enlist the aid of L E through its attorney, Douglas Patin, in bringing this action against the State. Patin agreed to cooperate.
Under this behind the scenes activity, unknown to the State, Fireman's Fund would shelve the federal court lawsuit to enforce the indemnity contract against L E in which it had a $750,000 prejudgment attachment and would file this suit against the State based on a legal theory that Penrose Wolf thought was "not too promising" and L E would delay its second arbitration proceeding until after Fireman's Fund brought its action and the federal action would be stayed pending the outcome of this suit.
On September 8, 1988 Fireman's Fund and L E jointly requested that the federal suit between them be stayed so that Fireman's Fund could bring this lawsuit. A stay in that action is still pending.
On July 11, 1991 L E filed a demand for arbitration with the State seeking "payment of (1) all amounts Leslie and Elliott may owe to Fireman's Fund for completion costs, including but not limited to consultant and attorney's fees; (2) all attorney's fees and costs relating to Leslie and Elliott's defense of an action filed by fireman's Fund arising out of the State's improper termination for default on the project." That arbitration has been stayed pending the outcome of this proceeding.
Both parties agree that for the purposes of this case they are bound by the decision of the 1988 arbitration to the effect that the State improperly terminated the contract with L E.
 III
Fireman's Fund argues that by virtue of the wrongful termination of the Contract, the State has breached its contract with Fireman's Fund, thereby entitling Fireman's Fund to recover all losses incurred as a consequence of the State's wrongful conduct. Fireman's Fund maintains that it entered into what it calls a "takeover agreement" with the State which incorporated the original bonded contract. In support of its contention, CT Page 4472 Fireman's Fund cites the language of the Agreement which states: "It is expressly understood and agreed by the parties hereto that the scope of the work to be completed is that work which is necessary to complete the contract obligations of L E as regards the Groton, Manchester and Danielson sites as set forth in the original contract between L E and the State, attached hereto as Exhibit 6." Fireman's Fund recites many of the principles applicable to suretyship law and maintains that the State's position in this case is at war with the traditional notions of suretyship — it relies quite heavily upon the surety's need to investigate within a short time once the demand has been made upon it under a bond and decide which course of action it should take. It maintains that the facts in this case present "textbook examples of the sureties good faith dilemma." It recites that it hired consultants to study the issues, attempted to make a good faith judgment as rapidly as possible, in deference to the financial and policy needs of the State and the financial needs of L E and, based upon this investigation, concluded that though fault could be allocated to both parties, the better view was that the termination was not wrongful and that once this conclusion was reached, it immediately agreed to complete the project "in order to minimize the State's financial losses and to accommodate the State's urgent need to comply with the consent decree," since there was great pressure upon the State to complete the project because of the time element of the consent decree.
Fireman's Fund points out that the Agreement states that the work to be performed by the surety at the four units/three sites is that which is reflected on schedules attached to the Agreement. It further maintains that the fact that both Fireman's Fund and the State agreed that certain latent defects had to be corrected and were included in the work to be done is evidence that the Agreement incorporated the Contract as it related to the four units/three sites. It also cites the understanding that so-called "general conditions" not mentioned in the text of the Agreement and the obligation to provide insurance, all of which are included in the Contract, lead to the conclusion that the March 3rd Agreement was "a takeover agreement." In addition, Plaintiff maintains that the language in the March 3rd Agreement "the State agrees upon completion of the work as defined herein and upon acceptance of the same by the State, Fireman's Fund shall have no further obligation to the State under the performance bond on Project No. BI-NM-212/219 and the State, if requested, shall release Fireman's Fund, in writing, from any CT Page 4473 further obligation on the performance bond" contemplates that the performance bond for the Contract will remain in effect until the work required under the Agreement was completed. It also points out that when the State attempted to re-bid the four units/three sites as separate contracts, it assigned a new project number to each, whereas in contrast the State administered the Agreement under the same project number as the original bonded contract.
Fireman's Fund further maintains that the State is collaterally estopped from denying that it wrongfully terminated the L E contract. It maintains that the question of fault in the termination of the Contract was fully litigated in the arbitration proceeding and that that decision is entitled to full collateral estoppel effect citing Corey v. Avco-Lycoming,163 Conn. 309, 316 (1972). The State, as indicated above, does not dispute the plaintiff's contention and maintains that it is not relitigating the question of fault in the termination of the Contract in this case but is simply denying any liability to Fireman's Fund for damages.
 IV
The State denies the principal allegations of the plaintiff and maintains that the March 3rd, 1986 Agreement between the State and Fireman's Fund was a settlement agreement. The State cites references to questions posed by plaintiff's counsel in which he acknowledges that the March 3rd Agreement was a settlement regarding the scope of the work to be engaged in and also quotes from certain correspondence from Allison Herman, the Fireman's Fund Claim Representative, referring to the fact that "a settlement was reached." The State maintains that the evidence at trial regarding Fireman's Fund's investigation of the cost to complete the original contract proved conclusively that had Fireman's Fund been forced to complete all eight houses, it would have suffered a major financial loss. The State points out that Fireman's Fund reviewed certain alternative solutions which required the completion of the original contract and these would result in a surety loss in excess of 1 million dollars, whereas, the completion of only four homes, getting the State to release fireman's Fund from any obligation to complete the other four would result in a surety loss of much less.
The State maintains that the evidence shows that Fireman's Fund entered into a settlement agreement to get out from under the obligation to build 8 homes at 6 sites and that this CT Page 4474 settlement was designed to save Fireman's Fund money. The State maintains that the March 3rd agreement did not "incorporate" the January 24, 1986 State — L E contract. It cites the following language from this agreement: "The scope of the work to be completed is defined by and in Exhibits No. 1 through 5, dated January 22, 1986. The aforementioned exhibits are incorporated in this agreement and made a part hereof as though fully set forth herein. It is expressly understood and agreed that the scope of the work to be completed is that work which is necessary to complete the contract obligations of L E as regards the Groton, Manchester, and Danielson sites as set forth in the original contract between L E and the State, attached hereto as Exhibit 6."
The State puts emphasis on the "magic language" of "made a part hereof as though fully set forth herein" by which the parties evidence their intent that the text of exhibits 1 though 5 are incorporated in full as part of the agreement but that exhibit 6 is not.
The State argues that Fireman's Fund did not complete all the work under the Contract. The State in maintaining that the Agreement is not a "takeover agreement" cites language of an early draft which reads "Fireman's Fund will take over and complete contract work. . ." as contrasted with the final version in which that language was deleted and the following was inserted "the Fireman' Fund [sic] will secure the completion, through a qualified contractor of its selection of the work to be performed, as defined elsewhere herein. . ."
 V
This court has heard the parties, examined their voluminous briefs and exhibits and is of the opinion that the contract of March 3, 1986 was not a "takeover agreement" as that term is usually applied in a typical suretyship case. It is also the opinion of the court that said Agreement was intended to be a settlement of a dispute between the State and Fireman's Fund; that the execution thereof, constituted an accord and that completion of the terms of said contract became a satisfaction within the meaning of the doctrine of "accord and satisfaction."
 A.
When the State failed to cajole L E into completing only the work on the four principal projects and unsuccessfully CT Page 4475 attempted to put them out for bid, and finally decided to make a claim against Fireman's Fund on its bond, it made it abundantly clear orally and in writing that it expected Fireman's Fund to complete the entire project under the January 26, 1984 contract.
Both the State and Fireman's Fund were fully aware of L E's position that the contract had been improperly terminated. In the court's opinion Fireman's Fund made a thorough examination of the situation between the State and L E and through the use of two professional consulting companies and through the use of its legal counsel and internal representatives arrived at a determination of its alternatives. It concluded that its least expensive alternative would be to negotiate with the State, taking advantage of the long delay in the completion of the contract and the pressure upon the State to show progress and its knowledge that the State had at one time offered concessions to L E. In arriving at its alternatives and the financial impact upon the company, Fireman's Fund had determined (albeit incorrectly) that in the conflict between L E and the State, the State would probably prevail. Fireman's Fund arrived at the conclusion that it would be in its best interests to reach a settlement of its differences with the State. It was sure enough of its position and the savings to it were so great that it was willing to take the risk.
In the opinion of this court, the Agreement was intended by both parties to be binding upon them and to release each of them from all claims that either might have against the other. The State relieved Fireman's Fund from the obligation of completing the entire January 26, 1984 contract, forgave liquidated damages of $250 per day for each day the construction was delayed, amounting to approximately $160,000.00; required only the completion of the four buildings on two sites and substituted for completion of the remaining four certain minor obligations, e.g. to fill and fence areas where some work had been completed. Despite the constant use of the words "take over" by Fireman's Fund, these words were eliminated in an early draft of the Agreement between the State and Fireman's Fund. The Agreement signed March 3, 1986 incorporated by reference only a portion of the January contract whereas if this were a true "takeover agreement," this Agreement would "incorporate and make a part hereof" the entire January 22, 1986 contract. The only place where such inclusive words are used is in a paragraph that states: "The scope of the work to be completed is defined in Exhibits No. 1 through 5, dated January 22, 1986. The CT Page 4476 aforementioned exhibits are incorporated in this agreement and made a part hereof as more fully set forth herein." These are the cost estimates for the completion of the project with respect to Danielson A, Danielson B, Groton and Manchester. This paragraph then goes on to read: "It is expressly understood and agreed that the scope of the work to be completed is that work which is necessary to complete the contract obligations of L E as regards the Groton, Manchester and Danielson sites as set forth in the original contract between L E and the State, attached hereto as Exhibit 6. Exhibit 6 is the original contract containing all of the work which was originally intended to be completed and unlike Exhibits 1 though 5, it is not "incorporated in this agreement and made a part hereof as though fully set forth herein." The reason is obvious. This contract did not call for the completion of the original contract.
It should also be noted that sheets 5 and 6 of Exhibit 5, having to do with guarantees, warranties and certificates, makes numerous changes in certain specifications in the original contract. Exhibit 7 attached to the Agreement contains specifications of the work to be done on each of the four remaining dwellings, such as fencing, filling, etc.
This is a contract drawn up by representatives of two highly sophisticated, very experienced organizations wherein the State makes very substantial concessions to Fireman's Fund within the atmosphere of substantial doubt as to the State's termination of L E and Fireman's Fund's obligations under its performance contract and Fireman's Fund saves a very substantial sum of money while the State gets a portion of its project completed. It can be nothing else but the settlement of a controversy between the two.
Although the plaintiff cited numerous cases for the proposition that a surety taking over an uncompleted contract has a right of action against a principal who terminated the contract improperly this court in arriving at its conclusion was impressed by the fact that neither party, nor the court, was able to cite a single case of wrongful termination where the surety did not agree to complete the entire original contract.
 B.
In the opinion of the court this settlement constituted an accord and, since it was completed within its terms as both CT Page 4477 parties agree, it was, therefore, a satisfaction of that accord.
Accord and satisfaction must be specially pleaded. Practice Book § 164; see Liberty Mutual Ins. v. Dean,6 Conn. L.Rptr. 430
May 20, 1992, Cofield, J. "An accord is a contract between creditor and debtor for the settlement of claim by some performance other than that which is due. Satisfaction takes place when the accord is executed." W. H. McCune, Inc. v. Revzon,151 Conn. 107, 109. Bull v. Bull, 43 Conn. 455, 462 Restatement, 2 Contracts § 417 comment a. "The discharge of a debt by accord and satisfaction occurs when a debtor renders performance different from that allegedly due his creditor and the creditor accepts the substituted performance in full satisfaction of the disputed claim." Gelreath v. Sentry Ins. Co., 38 CS 472, 423. "When there is a good faith dispute about the existence of a debt or about the amount that is owed, the common law authorizes the debtor and the creditor to negotiate a contract of accord to settle the outstanding claim." County Fire Door Corp. v. C. F.Wooding Co., 202 Conn. 277, 281. Robert S. Newman Partners v.CFC Construction Ltd. Partnership, 236 Conn. 750, 764. The policy of accord and satisfaction is to bar further litigation if the parties agree to satisfy all existing claims by means of a substituted performance. Geisco, Inc. v. Honeywell, Inc., 682 F.2d 54,57 (2d Cir. 1982). "Upon acceptance of the offer of accord, the creditor's receipt of the promised payment discharges the underlying debt and bars any further claim relating thereto, if the contract of accord is supported by consideration. County FireDoor Corporation v. C.F. Wooding Co., supra p. 281. In order to have an accord and satisfaction the parties must agree that the transaction constituted an accord and satisfaction and the defendant's performance must constitute sufficient consideration for a discharge. Geisco, Inc. v. Honeywell, Inc., 682 F.2d 54, 57
(1982). "The defense of accord requires that the defendant allege and prove a new agreement with new considerations." Gillis v.Gillis, 21 Conn. App. 549, 552. A contract of accord and satisfaction is sufficiently supported by consideration if it settles a monetary claim and is unliquidated in amount. CountyFire Door Corporation, supra, p. 222. A meeting of the minds between the parties is required. Gillis v. Gillis, supra, p. 552. Whether there has been a meeting of the minds is a question of fact for the jury to decide. However, "the court can infer the assent or meeting of the minds essential to an accord and satisfaction from the circumstances surrounding and the expressions accompanying the transaction in question." Swanson v.United Greenfield Corporation, 239 F. Sup. 299, 304 (D. Conn. CT Page 4478 1965). The defense of accord and satisfaction requires the defendant to allege and prove a new contract based upon a new consideration. There must be a meeting of the minds. The new consideration must be offered by the debtor and accepted by the creditor with intent to satisfy the whole claim. . . CrucibleSteel Co. v. Premier Mfg. Co., 94 Conn. 652, 656. "Satisfaction of a claim may be found in either a promise to settle or the full performance of that promise. Connecticut law comports with the view that the intention of the parties is determinative of whether a settlement agreement constitutes an executory accord or a substitute agreement." Air-Care N.O. Nelson Co. v. Patchet,5 Conn. App. 203, 205 (1985). The intent of the parties is generally considered to be a question of act. Id., 206. While the doctrine of accord and satisfaction generally arises in the context of an agreement between a creditor and a debtor to accept a lesser sum in satisfaction of the whole debt, the doctrine will also discharge a party's rights and duties pursuant to virtually any executory contract where the obligee agrees to accept a substituted performance in satisfaction of the original contract.Audubon Parking Associates Ltd. Partnership v. Barclay Stubbs,Inc., 225 Conn. 804, 809-812.
The established rule is that a valid accord and satisfaction operates as a complete discharge of the "obligor's existing duties and constitutes a defense to any attempt to enforce claims based on such duties," 1 Am. Jur. 2.d. Accord and Satisfaction § 1. See also W. H. McCune, Inc. v. Revzon, 151 Conn. 107,109 (1963).
To sum up, an accord is in essence a contract. In order to discharge a claim that is the subject of a settlement agreement under the doctrine of accord and satisfaction, the elements of a valid enforceable contract must exist. Gillis v. Gillis,21 Conn. at 549 (1990). In Connecticut the elements necessary to create a binding and enforceable contract are proper subject matter, competent parties, a meeting of the minds and consideration. In the opinion of the court the Agreement of March 3, 1986 between the State and Fireman's Fund was a valid and enforceable contract of settlement. As to subject matter virtually any claim, sounding in tort or contract, is capable of being discharged under the doctrine of accord and satisfaction. "All claims arising out of contract, express or implied, irrespective of their subject matter, may be the subject of an accord and satisfaction, provided such contracts are not tainted with illegality." 1 Am.Jur. 2.d Accord and Satisfaction § 6. Any controversy CT Page 4479 between parties that is actual and in good faith . . . is a proper subject matter for a binding contract or settlement."Edwin S. Thomas, Conservator. Appeal from Probate, 85 Conn. 50,52 (1911). As to the requirement of competent parties, there is no dispute that those executing the March 3 contract, i.e. the Accord, were competent to do so.
In the opinion of the court, the evidence is clear that the March 3 contract was supported by good and sufficient consideration. There was a bona fide and good faith dispute between the parties and the mutual agreement to settle the claim or obligation which was the subject of such a dispute constitutes sufficient consideration to support an accord. Tri-O, Inc. v.United States, 28 Fed. Cl. 463, 470 (1993); County Fire DoorCorp. v. C. F. Wooding co., 202 Conn. 277 (1987). Both parties to the Agreement fundamentally disagreed on the scope of Fireman's Fund's liability to complete the project pursuant to the performance bond. The State has insisted upon full completion of all eight units required under the original agreement and the imposition of liquidated damages, whereas Fireman's Fund agreed to the March 3 contract only after it succeeded in getting the State to reduce the scope of the original contract and waive the liquidated damages claim. The knowing relinquishment of some or all of the good faith, bona fide claim is clearly sufficient consideration to support a simple contract. Iseli Company v.Conn. Light Power Co., 211 Conn. 133 (1989). As to the requirement of the meeting of the minds, the plaintiff relies heavily upon the argument that there was no specific release language in the contract quoting Laka Tool and Stamping Co., Inc.v. United States, 639 F.2d 738 (CT. CL. 1980). The lack of an express release by Fireman's Fund of its rights under the State/L E contract does not preclude this court from finding that the March 3, 1986 Agreement constituted an accord and satisfaction. Such release language is unnecessary. "[W]hile an accord and satisfaction may contain an express release for the immediate discharge of a contractual right or obligation, a release constitutes no condition precedent to discharge by accord and satisfaction." McLain Plumbing and Electrical Service, Inc., etal v. United States, 30 Fed. CL. 70, 79 (1993) citing Tri-O, Inc.v. United States, supra.
From a practical point of view it is also quite clear that both parties to the March 3 Agreement intended that it should release both from all obligations that one may have to the other in the light of the practical state of affairs as existed at that CT Page 4480 time: L E had been terminated; L E did not accept the termination; L E had sued the State of Connecticut; Fireman's Fund after an exhaustive examination through two consulting companies, an attorney expert in the field and a competent home office staff, analyzed the situation and came to the conclusion that in spite of the claims of L E and doubt as to the correctness of the State's action it was in its best interest to resolve the matter promptly and with the least expense to itself. The State of Connecticut with the pressure on it to complete the original contract first demanded completion of same and insisted upon liquidated damages but in order to get the four principal places completed, agreed to substantially less than the original contract. All of the concerns of the parties were included in the March 3 Agreement and were resolved by them in that contract. It is the conclusion of this court that both parties to that contract fully understood that they were settling all claims that one might have against the other and there was a meeting of the minds.
As to the satisfaction, it is undisputed by the parties that the March 3 Agreement was fully performed. The reduced scope of the work was accomplished and the State paid Fireman's Fund in accordance with the Agreement. Full performance of all parties pursuant to an accord constitutes the satisfaction of all claims within the scope of the agreement, Geisco, Inc. v. Honeywell,Inc., 682 F.2d 54 (D. Conn. 1982). 1 Am.Jur. 2.3 Accord and Satisfaction § 1, W. H. McCune, Inc. v. Revzon, 151 Conn. 107,109 (1963).
 VI
The defendant has filed a counterclaim in five counts. In the first count the defendant alleges that the plaintiff has recklessly made false and fraudulent representations to the defendant upon which the defendant relied to its financial loss and damage. In this count the defendant maintains that the plaintiff, after its investigation of the termination of the L 
E contract, concluded that L E had defaulted in performance and that the termination was "proper and declared the same to the defendant." The defendant further maintains that "in good faith and reliance on the plaintiff's declaration that the termination of L E was proper, the defendant entered into a new and separate agreement. . ."
In its answer the plaintiff has denied the operative CT Page 4481 allegations and offers a special defense. "Assuming that plaintiff made any of the representations specified in Count One and that defendant relied on any of these representations, such reliance was not justifiable." The plaintiff offers no further clarification of the special defense in its pleadings or its briefs.
In the Second Count defendant alleges that the plaintiff reviewed the facts and "represented to the defendant that L E was in default under the construction contract and that the defendant was therefore justified in terminating. . ."; that plaintiff failed to exercise reasonable care or competence in investigating and obtaining the information for these representations and that plaintiff failed to exercise reasonable care in communicating these representations; that these representations were false and untrue; and that the defendant relied upon same to its financial loss.
Plaintiff has denied these allegations and offered two special defenses to this count. First, to the effect that assuming that plaintiff engaged in any negligent misrepresentations defendant was contributorily negligent in relying on any of these representations. And secondly, assuming that plaintiff engaged in any negligent misrepresentations and defendant relied on any, such reliance was not justifiable.
In the Third Count the defendant alleges breach of a duty to deal fairly and in good faith with the defendant maintaining that the plaintiff acted in an arbitrary manner in disregarding its duty to the defendant, acting only to further its own interest at the expense of the interest of the defendant in one or more of four different ways: a. Although it concluded that L E was in default and the termination was proper and declared the same to the defendant, it did not inform the defendant that if its conclusion later appeared to be erroneous, it intended to sue the defendant. b. It negotiated with defendant but did not disclose that it was reserving its rights to sue the defendant. c. It represented to defendant that all obligations and liabilities between the parties would be extinguished upon completion of the March 3, 1986 Agreement. d. That it used the arbitration decision as a premise for seeking recovery from the State disavowing all of its former representations and conclusions all to the damage of the defendant.
Plaintiff has denied all of the operative allegations of this CT Page 4482 count and entered a special defense to the effect that it was not under any legal duty to make the representations contemplated in that count.
In a Fourth Count the defendant alleges that the plaintiff had a fiduciary obligation to the defendant which it breached by failing to make a full disclosure, by failure to negotiate fairly and honestly and by acting contrary to the interest of the defendant.
The plaintiff has denied the operative allegations of this count and offered two special defenses, one to the effect that the surety is not a fiduciary of its obligee and secondly, that the plaintiff was not under a legal duty to make the representations contemplated in that count.
In the Fifth Count the defendant alleges that the plaintiff is in the conduct of a trade or commerce as defined in Section42-110a of the Connecticut General Statutes and that the acts and omissions of the plaintiff set forth in its counterclaim were and are unfair and deceptive acts and practices in the conduct of trade and commerce in violation of Section 42-110b et seq, of the Connecticut General Statutes, and that the defendant has suffered and will suffer financial loss and damage as a result of the plaintiff's unfair and deceptive acts and practices in the conduct of a trade or business.
In its answer the plaintiff denies these allegations and in addition has filed a special defense to the effect that assuming arguendo that plaintiff has engaged in any of the acts alleged and that any of these constitute a violation of the Connecticut Unfair Insurance Practices Act (CUIPA), [sic] Connecticut General Statutes § 38a-815 et seq. plaintiff has not engaged in any of these violations with sufficient frequency to indicate a general business practice of engaging in such conduct. (The court has been unable to locate any correction or clarification in the file with reference to the use of two different sections of the statute in the counterclaim and in the special defense thereto.
In addition to the special defenses aimed at the particular counts mentioned above, the plaintiff has filed an eighth special defense as to all counts to the effect that assuming that defendant is entitled to a judgment as to any of its counterclaims, defendant failed to mitigate its damages and that it was responsible for substantial delays in the completion of CT Page 4483 the units constructed at the Newington, Waterford, Groton, Danielson and Manchester sites.
The first count of the counterclaim rests on allegations of fraud and misrepresentation. Fraud is not to be presumed but must be proven by clear and satisfactory evidence. Miller v. Appleby,183 Conn. 51, 55 (1981); Alaimo v. Royer, 188 Conn. 36 (1982). Fraud must be proven by clear, concise and unequivocal evidence,Alaimo v. Royer, supra, p. 39; Kilduff v. Adams, Inc.,219 Conn, 314, 330 (1991).
In order to prevail in a claim of fraud, the plaintiff must prove (1) a representation made as a statement of fact, (2) that the representation was untrue and known to be untrue by the party making it, (3) that it was made for the purpose of having the other party act upon it, (4) the other party was in fact induced to act on it, (5) that he did so to his injury. Harper v.Adametz, 18 Conn. Sup. 435, Miller v. Appleby, supra, Kilduff v.Adams, Inc., supra. In the opinion of this court many of the allegations appearing in Count One are contrary to the evidence. The evidence in general falls far short of the standard of clear and convincing evidence necessary to sustain an allegation of false and fraudulent misrepresentation.
Contrary to the allegations in paragraph six of the first count, the plaintiff indicated to the defendant that the termination was "probably proper." There is no evidence that the defendant acted in reliance upon the plaintiff's declaration. Defendant was well aware that L E was controverting its termination and it acted in reliance on its own actions and not those of the plaintiff.
The plaintiff acted on its own initiative.
With respect to Count Two, alleging negligent misrepresentation, our Supreme Court has set forth the principle of negligent misrepresentation in D'Ulisse-Cupo v. Board ofDirectors of Notre Dame High School, 202 Conn. 206, 218 (1987). "One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance on the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. Citing Section 552 of the Restatement Second of Torts (1979). CT Page 4484
The evidence in this case falls far short again of showing that false information was supplied for the guidance of the defendant, that the defendant relied upon any such information and there is no evidence that the plaintiff failed to exercise reasonable care in communicating the results of its investigation to the defendant.
In the Third Count based upon breach of an alleged duty of the plaintiff to deal fairly and in good faith with the defendant, the defendant alleges that the plaintiff has acted in an arbitrary manner disregarding said duty to the injury of defendant. It is the opinion of the court that the defendant has failed to sustain its burden of proving its allegations. "[E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and in the enforcement." Warner v.Konover, 210 Conn. 150 (1989); see Restatement (Second), Contracts, Sec. 205. "The concept of good faith and fair dealing is essentially . . . a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." Derrastro v. Middlesex Insurance Company,207 Conn. 179, 190 (1988). "The implied good faith covenant relates to performance and enforcement of the contract. Section42a-1-203 of the Uniform Commercial Code provides: "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement." Cooper v. Burby,
Superior Court, Judicial District of Hartford/New Britain at Hartford, Docket No. 387563, April 29, 1992, Satter, J. "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with justified expectations of the other party. . ." Neiditz v.Housing Authority, 43 Conn. Sup. 283, 294 (1994), Holzberg, J. (citing Warner v. Konover, supra. However, "[t]he covenant of good faith and fair dealing presupposes that the terms and purposes of the contract are agreed upon by the parties and what is in dispute is a party's discretionary application or interpretation of a contract term." Neiditz v. Housing Authority,
supra, p. 294. Where the dispute does not concern a discretionary decision by the plaintiff but rather the existence of the contract itself, the issue is whether the agreement was induced by fraud not whether a party exercised bad faith in discharging their contractual obligations. Id. Where the issue is whether the contract was induced by fraud, and therefore unenforceable, the covenant of good faith and fair dealing is not implicated. Id. In the present case, the defendant's allegations of breach of good CT Page 4485 faith and fair dealing relates to the preagreement stage of its relationship with the plaintiff. The defendant does not allege that the plaintiff breached its duty of good faith and far dealing in its performance or enforcement of the contract. Since the defendant's allegations are limited to the preagreement stage, the covenant of good faith and fair dealing is not implicated. Accordingly, the plaintiff has failed to sustain its burden with reference to the third count.
The fourth count of the counterclaim alleges a breach of fiduciary obligations.
A fiduciary relationship may be found in situations where ". . . there is a justifiable trust confided on one side and the resulting superiority and influence on the other." Harper v.Adametz, 142 Conn. 218, 225 (1955). There is no fiduciary relationship between a surety and an obligee on a public works project. Ehmcke Sheet Metal v. Wausau, 755 F. Sup. 906, 193 (A.D. Cal. 1991). In re U.S. Grant Hotel Association, etc. 740 F. Sup. 1460,1468 (S.D. Cal. 1990). There is nothing in the law or in the evidence associated with this case that would lead to the conclusion that the plaintiff in this case was in any respect in a fiduciary relationship to the defendant. Both parties were on an equal footing, both were dealing at arm's length and both entered into an agreement which, in the opinion of this court, encompassed any and all obligations that one may have to the other. The evidence fails to make out a cause of action for breach of a fiduciary relationship.
In its fifth count the defendant alleges a breach of Section 41-110b et seq. of the Connecticut General Statutes (CUTPA). In considering whether conduct or a given practice is a violation of CUTPA, Connecticut courts consider the following elements: Whether the conduct offends public policy and is therefore unfair; whether the conduct is immoral, oppressive, unethical, or unscrupulous; and whether the conduct causes substantial injury to consumers or businessmen. McLaughlin Ford v. Ford MotorCompany, 192 Conn. 558, 568 (1984). In the opinion of this court the defendant has failed to show by clear, satisfactory and convincing evidence, the standard of proof under CUTPA, that the acts and omissions of the plaintiff were unfair and deceptive acts and practices in the conduct of a trade or commerce as alleged in its counterclaim.
Although the defendant spent much time on evidence of the CT Page 4486 behind the scenes activities of Fireman's Fund and L E in respect to their joint actions in delaying their suits, etc., and the defendant spends considerable space in its brief outlining these activities, the court is of the opinion that they are irrelevant to the issues in this case.
They were unknown to the defendant when they took place, post dated the Agreement and had no effect on the defendant's decision to enter into that Agreement.
 VII
In the opinion of this court the attempt by Fireman's Fund to seek damages for breach of the contract is barred by the doctrine of accord and satisfaction. Accordingly judgment may enter for the defendant, State, as to the plaintiff's case in chief.
The defendant has failed to sustain the allegations of the five counts of the counterclaims. Accordingly judgment may enter for the plaintiff, Fireman's Fund, as to the defendant's counterclaim.
Robert J. Hale, State Trial Referee