MACHELLE J. NEIDITZ ET AL. *v.* HOUSING AUTHORITY OF THE CITY OF HARTFORD

SUPERIOR COURT     JUDICIAL DISTRICT OF   FILE NO. 91063917HD
HARTFORD-NEW BRITAIN AT HARTFORD

Memorandum filed March 24, 1994

*Rogin, Nassau, Caplan, Lassman & Hirtle,* for the plaintiffs.

*Arnold & Associates,* for the defendant.

HOLZBERG, J. The plaintiffs in the present matter seek to recover unpaid rent due under the terms of a

ten year lease for a warehouse that the defendant housing authority of the city of Hartford (authority) intended to use for the storage of light trucks and equipment. The defendant's counterclaim alleges that it was induced to enter the lease by the plaintiffs' fraudulent misrepresentation that the premises were suitable as a garage for its light vehicles.

The two dispositive issues in the present case are: (1) whether the written terms of the lease, which provided that the defendant accepted the premises in "as-is" condition, constituted the parties' agreement; and (2) if the lease is integrated, such that parol evidence is inadmissible to alter its terms, whether the authority nevertheless can recover damages as a result of the plaintiffs' alleged fraudulent misrepresentations concerning the strength of the floor.

The following facts give rise to this dispute. On December 27, 1990, the parties entered into a ten year lease commencing January 1, 1991, for a warehouse owned by the plaintiffs. The building is a former furniture warehouse that the authority intended to use to garage light trucks and to store equipment. The base rent was $2500 with various escalations over the term of the lease.

Prior to the signing of the lease there were extended discussions and negotiations between the parties. In late August, 1990, the parties jointly inspected the premises. The authority's representative, Edgar Roberge, who serves as director of facilities, indicated to the plaintiffs that no lease would be agreed upon unless the authority was assured that the floor could adequately support the light vehicles it intended to park in the building.

In September, 1990, in response to the authority's concerns, the plaintiffs provided Roberge with a set of blueprints for the building. Roberge, in turn, transmit-

ted the prints to John Day, the authority's director of modernization, for his review and analysis. Day thereafter referred the plans to an architect who informally advised Day that the floor could support the type of vehicles the authority intended to garage there. Subsequently, at Roberge's request, the plaintiffs provided the authority with a written report from a structural engineer stating that the floor could support light vehicles.

In November and December, 1990, drafts of the lease were exchanged and reviewed by the parties and their counsel. Roberge reviewed the earliest draft before surgery required him to take an extended medical leave. Within the authority, Roberge has principal responsibility for the review of leases. Had he been available to review the final drafts, he would have insisted on the deletion of certain clauses that form the basis of this dispute, particularly the language stating that the authority accepted the premises in as-is condition. Roberge would have further insisted that before the lease was executed, the premises be inspected by an architect or structural engineer retained by the authority to determine whether the building was suitable for storing vehicles. In Roberge's absence his deputy reviewed and finalized the lease. After further review, comment and approval by the authority's counsel, the lease was duly signed and executed by the authority's executive director and chairman on December 27, 1990.

The lease recited that the authority accepted the building as-is in its present condition; that the lease was entered into for the purpose of the authority's parking of vehicles in the building; that the authority could park such vehicles in the building provided the floor was strong enough to permit such use; and that the authority agreed to inspect the premises before parking any vehicles in the building.

In January, 1991, after the lease was signed, the authority had the property inspected by an architect. He concluded that the cost of bringing the premises up to code for the intended use would be approximately $275,000, of which almost $70,000 was allocated for the repair of the floor. The authority also retained a civil engineer to evaluate the premises. He concluded that the building in its condition at that time could not accommodate the parking of light vehicles. One month later, in February, 1991, the authority informed the plaintiffs that it would make no further payments on the lease because of its belief that the plaintiffs fraudulently represented that the building was suitable for garaging the authority's vehicles. This action followed.

The authority freely acknowledges that it ceased paying rent after the first month of the lease. It claims, however, that it is not liable for the balance of the unpaid rent because the written contract does not accurately reflect the intention of the parties.[1] It urges the court to conclude that the plaintiffs represented, and the parties agreed, that the building was suitable structurally to serve as a garage for the defendant's vehicles. In order to reach this conclusion, however, it is necessary, as the defendant recognizes, to ignore certain provisions of the lease.

Specifically, paragraph 1.2 of the lease provides: "Use. The Premises are leased to Tenant for storage purposes and parking of vehicles. Tenant shall not use the Premises for any other purpose. Tenant shall not use the Premises for storage of any hazardous materi-

---

[1] The authority has filed a counterclaim sounding in fraudulent misrepresentation. Although it has not pleaded any special defenses, the authority has argued variously that it should be excused from performance because of mistake and because the plaintiffs have breached the implied covenant of good faith and fair dealing. Insofar as the plaintiffs have responded to these arguments in their memoranda, the court will consider these claims although they were not formally asserted in the authority's answer.

als. Tenant may park vehicles inside the building on the Premises if the floor is strong enough to support such vehicles. Landlord makes no representations regarding the strength of the floor. Tenant agrees to make a thorough inspection of the floor before parking any vehicles on it.''

Paragraph 9.4 provides: ''Other Repairs, Replacements, and Maintenance. Tenant shall maintain and repair, as necessary, all other portions of the Premises and the building and improvements thereon, at Tenant's expense. Tenant agrees that it is taking the Premises 'as-is', in its present condition. Tenant agrees that it will repair the floor where buckled. Tenant agrees to keep the Premises, including the structural portions of the Premises, in a neat and clean condition. Tenant also agrees to take such steps as may be reasonable or necessary to prevent vandalism or other damage by third parties.''

If the plain language of the lease is adhered to, the conclusion is inescapable that the authority accepted the premises in as-is condition with the plaintiffs expressly noting that they made no representations concerning the strength of the floor. The authority, however, insists that the written contract does not reflect the agreement of the parties.

Whether the authority can vary, alter or delete the express terms of the written lease depends on whether the contract is integrated. ''Whether the written contract was actually the final repository of the oral agreements and dealings between the parties depends on their intention, evidence as to which is sought in the conduct and language of the parties and the surrounding circumstances. If the evidence leads to the conclusion that the parties intended the written contracts to contain the whole agreement, evidence of oral agreements is excluded, that is, excluded from consideration

in the determination of the rights and obligations of the litigants, even though it is admitted on the issue of their intention. *Cohn* v. *Dun,* 111 Conn. 342, 346, 149 A. 851 [1930]. *Shelton Yacht & Cabana Club, Inc.* v. *Suto,* 150 Conn. 251, 254–55, 188 A.2d 493 (1963) . . . . (Citations omitted.) *Damora* v. *Christ-Janer,* 184 Conn. 109, 113–14, 441 A.2d 61 (1981). A written agreement is integrated and operates to exclude evidence of the alleged extrinsic negotiation if the subject matter of the latter is mentioned, covered or dealt with in the writing . . . if it is not, then probably the writing was not intended to embody that element . . . . *Cohn* v. *Dunn,* supra, 347; *Shelton Yacht & Cabana Club, Inc.* v. *Suto,* supra, 258; 2 Restatement (Second), Contracts § 215; 30 Am. Jur. 2d, Evidence § 1045. If the evidence, however, does not indicate that the writing is intended as an integration, i.e., a final expression of one or more terms of an agreement; 2 Restatement [supra] § 209 (1); then the agreement is said to be unintegrated, and the parol evidence rule does not apply. E. Farnsworth, Contracts, § 7.3., p. 452. Whether the parties intended to integrate their negotiations in writing is a question of fact for the court. *Jarvis* v. *Cunliffe,* 140 Conn. 297, 299, 99 A.2d 126 (1953); 2 Restatement [supra] § 210 (3)." (Internal quotation marks omitted.) *Associated Catalog Merchandisers, Inc.* v. *Chagnon,* 210 Conn. 734, 739–40, 557 A.2d 525 (1989).

One commentator has defined integration: "As a matter of substantive law, where the parties to an agreement adopt a writing as the final and complete expression of that agreement an integration results; the act of embodying those terms in the writing becomes the contract. Under such circumstances, extrinsic evidence to vary the terms of the written instrument is excluded because the writing is the contract itself."

(Internal quotation marks omitted.) 4 S. Williston, Contracts (3d Ed. Jaeger 1970) § 631, p. 961.

Whether a writing has been adopted as an integrated agreement is a question of fact to be determined in accordance with all relevant evidence. 2 Restatement, supra, § 209, comment (c). A written agreement complete on its face is taken to be an integrated agreement in the absence of contrary evidence. Id., § 209 (3); see *Associated Catalog Merchandisers, Inc.,* v. *Chagnon,* supra, 210 Conn. 740. The burden is on the party attempting to prove the absence of integration. If an agreement is determined to be integrated it renders inoperative any prior inconsistent written or oral agreements. 2 Restatement, supra, § 213 (1).

Whether a contract is integrated depends on the intention of the parties, "evidence as to which is sought in the conduct and language of the parties and the surrounding circumstances." (Internal quotation marks omitted.) *Associated Catalog Merchandisers, Inc.* v. *Chagnon,* supra, 210 Conn. 739. The following factors are considered significant in making this evaluation: first, whether the subject matter of the alleged extrinsic negotiation "is mentioned, covered or dealt with in the writing . . . if it is not, then probably the writing was not intended to embody that element"; (internal quotation marks omitted) id., 740; second, whether the written agreement was skeletal in nature or detailed; id.; third, whether the writing contained a recital that it was intended to constitute the parties' final agreement; 29A Am. Jur. 2d, Evidence § 1099 (1994); and fourth, whether counsel participated in the negotiations and drafting of the agreement. *Shelton Yacht & Cabana Club, Inc.* v. *Suto,* supra, 150 Conn. 254–55.

Consideration of the preceding factors dictates the conclusion that the written agreement in the present case was integrated. First, and most significant, is that

the subject matter of the agreement—the parking of trucks and the building's capacity to withstand their load—was explicitly mentioned in the contract. Paragraph 1.2 of the lease specifically notes that the premises "are leased to Tenant for storage purposes and parking of vehicles. . . . Tenant may park vehicles inside the building on the Premises *if the floor is strong enough to support such vehicles. Landlord makes no representations regarding the strength of the floor.*" (Emphasis added.) Paragraph 9.4 further provides that "[t]enant agrees that it is taking the Premises 'as-is', in its present condition." The authority also agreed in paragraph 9.4 that it would "repair the floor where buckled."

Second, the lease in the present case is detailed, consisting of over eleven pages and seventeen covenants. It is far from skeletal. *Associated Catalog Merchandisers* v. *Chagnon,* supra, 210 Conn. 740. Third, counsel for both parties were intimately involved in the negotiations and drafting of the lease. Numerous drafts were exchanged between the parties before they agreed to the final version. Although the lease does not recite that the written agreement embodies all of the parties' agreements, that omission, by itself, does not outweigh all of the other factors pointing to an integrated agreement.

The evidence in the present case demonstrates that prior to signing the lease the authority, with the assistance and cooperation of the plaintiffs, evaluated the premises and determined, at least preliminarily, that the building was suitable for storing light vehicles. The plaintiffs provided the authority with a set of blueprints that formed the basis for an architect's rendering an informal opinion to the authority that the floor could support light vehicles. The plaintiffs also provided the authority with a written report from a structural engineer affirming the sufficiency of the strength of the

floor. Equally significant is that Roberge testified that he did not rely on statements or representations made by the plaintiffs. Instead, it was his intention to obtain a report by the authority's own expert. Finally, the lease was signed after review and approval by counsel.

It is reasonable to conclude from this information that the authority agreed to accept the premises in as-is condition, as recited in the lease, without any representation by the plaintiffs regarding the strength of the floor, and also agreed that it would undertake its own evaluation of the floor to determine its suitability for use as a garage. Under these circumstances, the authority has not sustained its burden of demonstrating that the contract was not integrated. Accordingly, the authority cannot vary by parol evidence the terms of the written lease.

This case falls squarely within Williston's admonition that "[o]ne cannot enter into a contract and, when called upon to abide by its conditions, say that he did not read it, when he signed it, or did not know what it contained . . . ." (Internal quotation marks omitted.) 4 S. Williston, supra, § 631, p. 953. Although this is a concededly harsh result in view of the vital public service provided by the authority as a not-for-profit provider of housing of last resort, this court is unaware of any rule that allows it to relieve the authority of its obligations under the circumstances of this case when the contract was entered into after arm's length negotiations in which both parties were represented by counsel.

The authority's counterclaim sounds in fraudulent misrepresentation. In its posttrial brief, however, the authority argues that the plaintiffs violated the implied covenant of good faith and fair dealing. Both arguments rely on the same parol evidence that the author-

ity sought to introduce to prove the contract's lack of integration.[2]

"Fraud and misrepresentation cannot be easily defined because they can be accomplished in so many different ways. They present, however, issues of fact." (Internal quotation marks omitted.) *J. Frederick Scholes Agency* v. *Mitchell,* 191 Conn. 353, 358, 464 A.2d 795 (1983). A fraudulent misrepresentation is actionable if: (1) the misrepresentation was made as a statement of fact; (2) the misrepresentation was untrue and known to be untrue; (3) the misrepresentation was made to induce the other party to act; and (4) the other party acted to its detriment. *Maturo* v. *Gerard,* 196 Conn. 584, 587, 494 A.2d 1199 (1985).

For any number of reasons, singly or in combination, the authority has not sustained its burden of proving by clear, precise and unequivocal evidence; *Tyers* v. *Coma,* 214 Conn. 8, 11, 570 A.2d 186 (1990); that the plaintiffs fraudulently misrepresented the strength of the floor.[3]

First, the authority's witness, Roberge, testified that he did not rely on the plaintiffs' opinion and statements concerning the floor. Although the authority was provided, at its request, with a set of blueprints and an engineering report, it was the authority's intention to

---

[2] "Parol evidence is admissible (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) *to show mistake or fraud.*" (Emphasis added.) *Jay Realty, Inc.* v. *Ahearn Development Corp.,* 189 Conn. 52, 56, 453 A.2d 771 (1983). For the limited purpose of supporting the authority's claim of fraudulent misrepresentation, therefore, parol evidence concerning the parties' negotiations, representations and agreements is admissible.

[3] Connecticut law has firmly established that fraud must be proven by a standard more exacting than that of a fair preponderance of the evidence. *J. Frederick Scholes Agency* v. *Mitchell,* supra, 191 Conn. 353; *Clark* v. *Drska,* 1 Conn. App. 481, 473 A.2d 325 (1984).

obtain its own expert evaluation prior to signing the lease. Had Roberge not been incapacitated during the critical stage of the negotiations, he would have obtained the authority's own report. Additionally, the parties' understanding that the authority would rely on its own expert evaluation is reflected in paragraph 1.2 of the lease, which provides that the authority would make a "thorough inspection of the floor before parking any vehicles on it."

Second, even if it is assumed that the plaintiffs' statements could be understood as assertions of fact and not mere opinion, the authority has failed to prove that either their statements or the statements of their engineer were untrue and known to be untrue. The most that can be said is that the parties' experts hold different opinions as to the strength of the floor. There is no evidence to support the claim that either the plaintiffs or their experts knowingly made misrepresentations to the authority. Indeed, it appears that if any errors in analysis were made, they are attributable to the expert of the authority, not the plaintiffs' expert.

Finally, if the authority acted to its detriment, that result is attributable to a breakdown in its internal procedures for review and approval of leases. At every juncture prior to the signing of the lease the authority had the opportunity to conduct its own evaluation of the building and, in fact, reserved that right under the terms of the lease. It did not sign the lease until after its review and approval by counsel. Although Roberge's absence at a critical time undoubtedly affected the negotiations, that alone does not transmute the plaintiffs' statements into fraudulent misrepresentations.

The authority argues that the plaintiffs breached the implied covenant of good faith and fair dealing. The authority correctly notes that the Supreme Court has imposed on both landlord and tenant an implied cove-

nant of good faith and fair dealing. *Warner* v. *Konover,* 210 Conn. 150, 154, 553 A.2d 1138 (1989). Quoting the comment to § 205 of the Restatement (Second) of Contracts, the court noted: "The phrase 'good faith' is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." (Internal quotation marks omitted.) Id., 155.

The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. The dispute in the present case, however, does not concern a discretionary decision by the plaintiffs, but rather the existence of the contract itself and its terms. The issues in the present case are whether the written lease represents the parties' agreement and, if so, whether the contract was induced by fraud, not whether the plaintiffs exercised bad faith in discharging their contractual obligations. Under these circumstances, the covenant of good faith and fair dealing is not implicated.

Accordingly, judgment shall enter in favor of the plaintiffs as to their complaint and as to both counts of the authority's counterclaim.

The remaining issue concerns the extent of the plaintiffs' damages. The plaintiffs presented evidence concerning: (1) the difference between the values of the lease with the authority and that with the subsequent tenant; (2) expenses arising out of the efforts to obtain

a new tenant; (3) miscellaneous expenses arising out of the authority's breach; and (4) attorney's fees. The plaintiffs seek $231,213 in damages.

The law governing contract damages is well established. "[C]ontract damages are awarded to place the injured party in the same position as he would have been in had the contract been fully performed. . . . [T]here is no unbending rule as to the evidence by which such compensation is to be determined . . . damages may be based on reasonable and probable estimates. . . . [T]he court must have evidence by which it can calculate the damages, which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount." (Citations omitted; internal quotation marks omitted.) *Fuessenich* v. *DiNardo,* 195 Conn. 144, 153, 487 A.2d 514 (1985).

While the plaintiffs are entitled to recover those damages that would naturally flow from the breach, they are also under an obligation to minimize the damages arising out of the authority's breach. "The duty to mitigate damages [does] not require the plaintiff to sacrifice any substantial right of its own . . . or to exalt the interests of the tenant above its own. . . . It [is] required to make reasonable efforts to minimize damages. What constitutes a reasonable effort under the circumstances of a particular case is a question of fact for the trier." (Citations omitted.) *Danpar Associates* v. *Somersville Mills Sales Room, Inc.,* 182 Conn. 444, 446, 438 A.2d 708 (1980).

Paragraph 12.6 of the lease provides that the "[l]andlord shall be entitled to recover from Tenant all damages, including but not limited to lost rent, reasonable expenses of maintaining the Premises while they are vacant, and all expenses, including reasonable attorneys' fees, incurred by Landlord in recovering pos-

session of the Premises and reletting the Premises . . . ." The following claims for damages arise under this paragraph.

The plaintiffs claim that the difference between the rent they would have received under the authority's ten year lease and the six year lease they entered into after the authority's default is $163,614. The authority vacated the premises after paying only one month's rent on a ten year lease. After the authority vacated in February, the plaintiffs listed the property with Dow and Condon, a major commercial broker in Hartford. Under the listing agreement the broker was responsible for advertising and other marketing efforts.

In February, 1992, the plaintiffs entered into a six year lease with a five year option with Capitol City Woodworking, Inc. That lease provided that the tenant would pay no rent for the first year of the lease (February, 1992 through January, 1993) and would pay an annual rent of $27,754 in the second year. The lease also provides for an approximate 5 percent rental increase during each year of its existence. The plaintiffs have demonstrated that the difference between the rents of the two leases over the ten year period of the authority lease (after deducting the security deposit and adding late charges) is $163,614. In the absence of any evidence of the contrary, the court is satisfied that the plaintiffs made reasonable efforts to mitigate damages and are entitled, therefore, to damages of $163,614.

The plaintiffs also claim additional damages of $9156 for utilities, security and insurance during the one year that the building remained vacant. Paragraph 12.6 of the lease clearly allows for such recovery, and, accordingly, the plaintiffs are awarded damages in that amount.

Paragraph 12.6 allows the plaintiffs to recover expenses connected with reletting the premises. The plaintiffs' evidence indicates that $14,894 was spent in this regard. These expenses were necessary and reasonable and, therefore, are also awarded as damages to the plaintiffs.

The total of all damages awarded to the plaintiffs is $187,664 plus reasonable attorney's fees in the amount of $28,000 and costs.