## L & R REALTY ET AL. *v.* CONNECTICUT NATIONAL BANK
### (AC 14969)

## CONNECTICUT NATIONAL BANK *v.* L & R REALTY ET AL.
### (AC 16092)

Lavery, Hennessy and Kulawiz, Js.

Argued December 15, 1998—officially released June 1, 1999

*Robert G. Skelton,* for the appellants (L & R Realty et al.).

*Robert M. Dombroff,* with whom was *Ann M. Siczewicz,* for the appellee (Fleet National Bank).

*Opinion*

LAVERY, J. These consolidated appeals return to this court on remand from our Supreme Court.[1] The appeals arise out of a mortgage transaction between L & R Realty (L & R), a partnership, and its general partners Raymond LeFoll (LeFoll) and Gail LeFoll (collectively the LeFoll parties) and Connecticut National Bank (bank).[2] On appeal, the LeFoll parties claim with respect

[1] See *L & R Realty* v. *Connecticut National Bank,* 246 Conn. 1, 715 A.2d 748 (1998), where our Supreme Court reversed this court's divided decisions in *L & R Realty* v. *Connecticut National Bank,* 46 Conn. App. 432, 699 A.2d 291 (1997), and *Connecticut National Bank* v. *L & R Realty,* 46 Conn. App. 443, 699 A.2d 297 (1997), and affirmed the trial court's granting of the bank's motions to strike from the jury list the mortgage subordination claim in the first case and the counterclaim in the second case.

[2] Connecticut National Bank's interest in the mortgage subsequently passed to Shawmut Bank Connecticut, N.A., and then to Fleet National Bank.

to their lender liability action against the bank, in which the trial court rendered judgment for the bank, that the trial court improperly (1) determined that the parties' oral agreement to subordinate the bank's mortgage to a construction loan was unenforceable, (2) determined that the bank was excused from subordinating its mortgage to a construction loan because L & R could not satisfy the conditions precedent to a construction mortgage commitment by Mechanics Savings Bank (Mechanics), (3) determined that the LeFoll parties failed to mitigate their damages and (4) failed to recuse itself. With respect to their appeal of the judgment of strict foreclosure in the bank's foreclosure action, the LeFoll parties claim that the trial court (1) improperly found sufficient evidence to support a judgment in the bank's favor, (2) lacked jurisdiction to set law days after the dismissal of the first appeal, (3) improperly awarded attorney's fees, (4) improperly determined that the bank could enforce the note and (5) improperly determined that the subordination agreement was unenforceable.[3] We affirm the judgments of the trial court.[4]

The trial court found the following facts necessary for our resolution of these appeals. L & R is a general partnership originally formed by LeFoll and Curtis Roggi[5] to develop real estate in this state. In September,

[3] "Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one [issue] . . . [M]ultiplying assignments of error will dilute and weaken a good case and will not save a bad one. . . . Most cases present only one, two, or three significant questions. . . . Usually . . . if you cannot win on a few major points, the others are not likely to help. . . . The effect of adding weak arguments will be to dilute the force of the stronger ones. . . . State v. Pelletier, 209 Conn. 564, 567, 552 A.2d 805 (1989)." (Internal quotation marks omitted.) State v. Cruz, 40 Conn. App. 515, 525–26, 672 A.2d 502, cert. denied, 237 Conn. 909, 675 A.2d 457 (1996).

[4] Judge Kulawiz participated fully in the decision represented by this opinion and agreed with the opinion prior to her death on April 19, 1999.

[5] Roggi was never a party to the litigation at issue in these appeals.

1989, Roggi withdrew as a partner of L & R. Thereafter, LeFoll's wife, Gail LeFoll, became a partner in Roggi's stead.

LeFoll has practiced law in Connecticut since 1969 and has represented a wide spectrum of clients, concentrating his practice in real estate. LeFoll has also engaged in real estate development and, at the time of the events in question, he had substantial experience and expertise in that business. He owns a number of commercial properties in Rocky Hill and East Granby and has developed real estate in St. Maarten.

In 1985, LeFoll began to work with Francis Wamester, a friend from high school, who was a commercial loan officer with the bank. Wamester had been in banking for many years and had supervised many loans. Prior to negotiating the loan that is the subject of this litigation, Wamester had been involved with nine or ten loans involving LeFoll, all of which had been satisfactorily concluded. Wamester had also visited LeFoll at his vacation home in St. Maarten.

In 1988, LeFoll wanted to purchase land in Colchester and approached Wamester to arrange financing from the bank. LeFoll alleges that Wamester represented to him in December, 1988, that the bank would agree to subordinate its mortgage to a construction loan in the future. Although Wamester acknowledges that he said that the bank would subordinate its mortgage to a construction loan, Wamester and LeFoll never agreed on the terms of any subordination agreement.

At the June 30, 1989 closing, the bank lent to L & R $500,000 to acquire and develop three acres of real property in Colchester. At that time, Wamester again discussed the bank's subordinating the mortgage to a

future construction loan but, again, no terms of a subordination agreement were established.[6] At the closing, the bank obtained a commercial note (note),[7] a guarantee agreement (guarantee),[8] a mortgage[9] and collateral assignment and security agreements[10] (collectively the closing documents). LeFoll claimed that by signing the closing documents he created an enforceable oral agreement obligating the bank to subordinate the mortgage. This oral agreement is the basis of the LeFoll parties' lender liability action.

At the closing, attorney James Ripper delivered a letter to the bank in which he opined that the note and

[6] The LeFoll parties allege that Wamester's representations became enforceable at the closing, and LeFoll testified that he would not have signed the closing documents without the unconditional subordination agreement.

[7] The trial court's memorandum of decision states that L & R delivered to [the bank] . . . [a] commercial promissory note in the principal amount of $500,000 ('the note'). The note provided by its terms that the obligor (L & R) was to pay interest only, and, although the note states on its face that principal was payable on demand, attached to it was an addendum indicating that the principal was to be paid no later than December 31, 1991. The note in form is not a skeletal promise to repay moneys loaned, and does not serve merely as evidence of L & R's obligation to repay $500,000 to [the bank]. The note also contains a detailed recitation of the terms and conditions relating to repayment, defined the circumstances constituting a default, described the bank's remedies in the event of a default, and expressly provided that, in the event of a default, [the bank] would become entitled to recover the costs incurred to enforce collection."

[8] The trial court's memorandum of decision states that L & R also delivered "[a] guarantee agreement by which LeFoll and Roggi personally guaranteed payment of the note. In September, 1989, when Roggi withdrew from L & R, and Gail LeFoll delivered her personal guarantee of the note to [the bank], [the bank] released Roggi from the guarantee."

[9] The trial court's memorandum of decision states that L & R also delivered "[a] mortgage by which L & R created a first mortgage lien in the Colchester property in favor of [the bank] to secure due performance of L & R's obligations under the note. The [bank's] mortgage in form is not a skeletal document. It contains a detailed recitation of the rights and interests of [the bank] as mortgagee, and very clearly defines the priority of the lien intended to be created by the instrument."

[10] The trial court's memorandum of decision states that L & R also delivered "[a] collateral assignment of rents and a security agreement by which L &

mortgage constituted "legal, valid and binding obliga-
tions enforceable against" the LeFoll parties in accor-
dance with their respective terms.[11] The opinion letter
twice states that Ripper was acting as attorney for the
borrower.[12] Although Ripper's file contained a note
referring to future subordination, the opinion letter did
not mention the bank's agreeing to subordinate the
mortgage to a future mortgage or suggest that L & R's
obligation under the note or the bank's right to foreclose
the mortgage upon default of the note was subject to
the bank's performance under an oral subordination
agreement. Ripper was unaware of any enforceable
agreement between the bank and L & R obligating the
bank to subordinate the mortgage to a future construc-
tion mortgage.[13]

Following the closing, as was his responsibility,
Wamester wrote a memorandum to the bank's files in
which he briefly memorialized the material terms of
the loan. He did not mention a subordination agreement
and the memorandum cannot reasonably be read to put
Wamester's superiors or any bank regulator on notice
that enforcement of the note or mortgage was condi-
tioned on a subordination agreement. Wamester wrote

R provided [the bank] with further security for the performance of L & R's
obligations due under the note."

[11] Ripper testified that by opining that the note and mortgage were valid
and enforceable, he meant that, if the LeFoll parties were in default, the
bank could bring legal action to recover on the note and to foreclose the
mortgage and would prevail.

According to its memorandum of decision, the trial court's conclusion
that the closing documents constituted an integrated agreement concerning
the nature, priority and duration of the lien created by the mortgage was
reinforced by Ripper's opinion.

[12] At trial, however, Ripper testified that he was acting as attorney for
both the LeFoll parties and the bank and he understood that the opinion
letter was something on which the bank might rely.

[13] If there were a subordination agreement, Ripper testified, the mortgage
deed would have been written differently. If he thought that a subordination
agreement existed, Ripper would not have opined that the mortgage was
valid and enforceable in accordance with its terms.

another memorandum to the bank's files on December 30, 1989, again describing the material terms of the loan transaction, which also fails to mention an oral agreement to subordinate the mortgage to a future loan. The first document mentioning the alleged subordination agreement came into existence in July, 1990. Originally, LeFoll intended to construct two office buildings on the Colchester property, but, during the summer of 1990, he decided to develop the property as a strip shopping center. In a letter dated July 9, 1990, LeFoll advised Wamester of his change of plans and mentioned their oral agreement to subordinate the mortgage.

Thereafter, Wamester left the bank's employ and Diane Murphy became responsible for supervising the loan. Murphy reported to Richard O'Brien, senior vice president of the bank. Neither Murphy nor O'Brien had been informed by Wamester of any agreement to subordinate the L & R mortgage to a construction mortgage. They did understand that Wamester had agreed with LeFoll to devise a plan whereby the mortgage could be subordinated to a construction loan, although the bank was under no obligation to do so. On October 26, 1990, Murphy prepared a letter to LeFoll in which she set forth the terms of an agreement to subordinate the mortgage, which she had discussed with LeFoll and O'Brien. If he agreed with the terms of the agreement as set forth in the letter,[14] LeFoll was to sign and return it. On or about November 21, 1990, LeFoll signed and returned the letter.[15] LeFoll also wrote a letter to Murphy on November 21, 1990, in which he purported to describe the essence of the agreement. The substance

---

[14] Stated simply, the bank would subordinate its mortgage only if the bank secured additional collateral from the LeFoll parties.

[15] LeFoll understood the October 26, 1990 letter to be legally enforceable but neither the LeFoll parties' complaint nor their counterclaim in the foreclosure action alleges that the bank breached the terms of the letter; they merely alleged that it confirmed the oral agreement between LeFoll and Wamester.

of the terms and conditions of the subordination agreement as contained in the October 26, 1990 letter and the November 21, 1990 letter were different.

In the meantime, LeFoll was negotiating with Mechanics to obtain a construction mortgage that, upon completion of the project, would convert to a permanent mortgage. A number of conditions were prerequisites to the construction loan, including the bank's releasing the mortgage on the Colchester property and placing it on another LeFoll property. Mechanics would not close on the construction loan without a release of the bank's mortgage or the bank's subordinating its mortgage and entering into a standstill agreement whereby, among other things, the bank would not foreclose on its mortgage. LeFoll never met Mechanics' conditions to close on the construction loan.

In April, 1991, L & R failed to pay interest on the note for March, 1991. LeFoll failed and refused to pay the bank because the bank had orally refused to subordinate its mortgage to the lien of Mechanics' construction mortgage. LeFoll submitted no written subordination agreement to the bank to be signed. On May 17, 1991, the bank issued default notices and made demands on the LeFoll parties for payment of the entire principal and accrued interest due. A foreclosure action against the LeFoll parties was commenced in February, 1992.

The LeFoll parties initiated an action against the bank shortly thereafter. They sought compensatory and punitive damages on a number of theories: (1) breach of alleged contract to subordinate the mortgage, (2) promissory estoppel precluding the bank from refusing to subordinate its mortgage, (3) breach of obligations of good faith and fair dealing with respect to subordination of the mortgage, (4) fraud inducing L & R to borrow in the first instance, (5) wrongful interference by the bank

with L & R's relationship with a prospective construction mortgage lender, (6) economic distress and (7) violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. The LeFoll parties asserted those same claims as counterclaims or special defenses to the bank's foreclosure action.

Prior to trial, the trial judge disclosed that he was a former shareholder and current depositor of the bank. The LeFoll parties did not object or move the trial judge to recuse himself. The cases, which were consolidated for trial, were tried to the court. The trial court concluded that the closing documents constituted the complete, final and integrated expression of the parties' intention concerning the nature, priority and duration of the lien that L & R provided the bank to secure the repayment of the $500,000 loan. None of the documents mentions or references any agreement by the bank to subordinate the mortgage to any mortgage that L & R might thereafter place on the Colchester property to secure any construction, permanent or other loan to L & R. The trial court rendered judgment in favor of the bank on both the foreclosure and lender liability actions. These appeals followed.[16]

I

The issue that is central to the LeFoll parties' appeal of both their lender liability action and the bank's foreclosure action is their claim that the trial court improperly determined that there was no enforceable

---

[16] The LeFoll parties have asserted four claims in their appeal of the lender liability action and five in their appeal of the bank's foreclosure action. Some of the claims are identical. For purposes of our analysis, we will address the claims as follows: the trial court improperly (1) determined that the oral agreement between the LeFoll parties and the bank was unenforceable, (2) determined that the bank could enforce its note, (3) failed to recuse itself, (4) determined that the bank was excused from subordinating its mortgage to a construction loan because L & R could not satisfy the conditions precedent to the loan commitment from the bank, (5) lacked jurisdiction to set law days after the dismissal of the LeFoll parties' first appeal,

agreement obligating the bank to subordinate its mortgage to a future construction loan. We disagree with that claim.

The premise of the LeFoll parties' lender liability action and defense of the bank's foreclosure action is that the conversations between LeFoll and Wamester in December, 1988, and at the closing resulted in a legally enforceable, unconditional agreement by the bank to subordinate its first lien on the Colchester property to the lien of any construction or permanent mortgage that L & R might give to an institutional lender, and that such unconditional subordination was a prerequisite to the bank's right to enforce its rights under the note and mortgage.

"The existence of a contract is a question of fact to be determined by the trier on the basis of all of the evidence. *Fortier* v. *Newington Group, Inc.*, 30 Conn. App. 505, 509, 620 A.2d 1321, cert. denied, 225 Conn. 922, 625 A.2d 823 (1993)" (Internal quotation marks omitted.) *Avon Meadow Condominium Assn., Inc.* v. *Bank of Boston Connecticut*, 50 Conn. App. 688, 695, 719 A.2d 66, cert. denied, 247 Conn. 946, 723 A.2d 320 (1998). To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. See *Ubysz* v. *DiPietro*, 185 Conn. 47, 51, 440 A.2d 830 (1981); *Augeri* v. *C. F. Wooding Co.*, 173 Conn. 426, 429–30, 378 A.2d 538 (1977); *Cavallo* v. *Lewis*, 1 Conn. App. 519, 520, 473 A.2d 338 (1984). "To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties." *Bridgeport Pipe Engineering Co.* v. *DeMatteo Construction Co.*, 159 Conn.

(6) found sufficient evidence to support the foreclosure judgment, (7) determined that the LeFoll parties failed to mitigate their damages and (8) awarded the bank attorney's fees.

242, 249, 268 A.2d 391 (1970). If the minds of the parties have not truly met, no enforceable contract exists. See *Fortier* v. *Newington Group, Inc.*, supra, 510. "[A]n agreement must be definite and certain as to its terms and requirements." (Internal quotation marks omitted.) Id. "So long as any essential matters are left open for further consideration, the contract is not complete." 17A Am. Jur. 2d, Contracts § 32 (1991).

Our review is limited to determining "whether the trial court's legal and factual conclusions are supported by the facts stated in the court's memorandum of decision and whether the subsidiary facts themselves are supported by the evidence. *Transportation Plaza Associates* v. *Powers*, 203 Conn. 364, 378, 525 A.2d 68 (1987). On appeal, we determine only whether in light of the evidence in the whole record, the court's decision was clearly erroneous. We will not retry the facts. *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980)." *Hart, Nininger & Campbell Associates, Inc.* v. *Rogers*, 16 Conn. App. 619, 626–27, 548 A.2d 758 (1988).

"This court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . In a case that is tried to the court, such as the present case, the judge is the sole arbiter of the credibility of witnesses, and the weight to be given to their specific testimony." (Citations omitted; internal quotation marks omitted.) *Arena* v. *Commissioner of Correction*, 51 Conn. App. 505, 507, 723 A.2d 1155, cert. denied, 248 Conn. 903, 732 A.2d 178 (1999). "As such, the trial court is free to accept or reject, in whole or in part, the evidence presented by any witness, having the opportunity to observe the witnesses and gauge their credibility. . . . In considering the evidence introduced in a case, [triers of fact]

are not required to leave common sense at the court-room door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand, to the end that their action may be intelligent and their conclusions correct." (Citation omitted; internal quotation marks omitted.) *State* v. *Sandra O.*, 51 Conn. App. 463, 468, 724 A.2d 1127 (1999).

The trial court found that the closing documents constituted the complete, final and integrated expression of the parties' intention concerning the nature, priority and duration of the lien that L & R provided the bank to secure the repayment of the $500,000 loan. The trial court also found (1) that the parties never entered into a binding, enforceable agreement that the bank would unconditionally subordinate its lien to a construction lien because the parties did not agree to the terms of the subordination, (2) that the LeFoll parties did not prove pursuant to the parol evidence rule that the closing documents did not constitute an integrated agreement concerning (a) the terms and conditions governing repayment of the loan under the note, (b) the terms and conditions governing the bank's rights to foreclose under the mortgage, (c) the terms and conditions governing the parties' rights and obligations under the guarantees and (d) the nature, priority and duration of the lien, (3) that the alleged oral agreement was barred by the statute of frauds; see General Statutes § 52-550; and (4) that General Statutes § 49-31c does not apply to the facts here as the October 26, 1990 letter is not a memorandum memorializing an oral subordination agreement. Although they disagree with its ultimate factual conclusions, the LeFoll parties do not dispute the trial court's subordinate factual findings.

## A

The first issue is whether the subordinate facts support the trial court's ultimate factual conclusion. On

the basis our review of the record and the trial court's comprehensive and detailed memorandum of decision, we agree that the closing documents constituted the complete, final and integrated expression of the parties' intention concerning the nature, priority and duration of the mortgage that L & R provided the bank to secure repayment of the $500,000 loan. We also agree that the closing documents do not mention or refer to any subordination agreement between the bank and the LeFoll parties.

The trial court's memorandum of decision also reveals that, although bank officers agreed to subordinate the bank's lien on the Colchester property to a construction financing lien, LeFoll and the bank never agreed on the terms and the conditions of the subordination agreement. This fact is made most clear by the differences between Murphy's October 26, 1990 letter and LeFoll's November 21, 1990 response. According to Murphy's letter, the bank agreed to subordinate its mortgage on the Colchester property to the Mechanics' construction mortgage *and*, in lieu of its first mortgage position on the Colchester property, assume a second mortgage position on the real estate and improvements at 2301 Silas Deane Highway in Rocky Hill. Although he signed and returned the October 26, 1990 letter to Murphy indicating that he agreed with its recitation of the terms of the subordination agreement proposed by the bank, LeFoll, in his November 21, 1990 letter to Murphy, wrote that the bank "would one, subordinate the five hundred thousand dollar mortgage to a Mechanics mortgage, *or* two, take a second mortgage position on 2301 Silas Deane and release the mortgage in Colchester."

LeFoll is both an experienced real estate lawyer and developer. Ripper, the attorney who supplied the opinion letter concerning the enforceability of the closing documents, opined that the terms and conditions of the

closing documents would have been materially different had there been an enforceable subordination agreement in effect at the time of the closing. Wamester, who testified on behalf of the LeFoll parties, corroborated LeFoll's position that Wamester had agreed to subordinate the bank's lien as early as December, 1989, but he assumed that the bank would require some additional collateral to protect its investment if there was insufficient equity in the Colchester property to provide security and those details were not resolved prior to the closing.

We conclude, therefore, that the subordinate facts support the trial court's conclusion that there was no agreement between the parties as to the terms of the subordination agreement. The trial court, therefore, properly determined that there was no enforceable subordination agreement.

## B

The LeFoll parties also claim that the trial court improperly determined that they had not met their burden of proving the existence of the subordination agreement to alter the terms of the closing documents pursuant to the parol evidence rule. We disagree.

"[T]he parol evidence rule is not a rule of evidence, but a substantive rule of contract law. . . . The rule is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. . . .

"The parol evidence rule does not of itself, therefore, forbid the presentation of 'parol evidence,' that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the *use* of such evidence *to vary or contradict the terms* of such a contract. Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant. By implication, such evidence may still be admissible if relevant (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud. . . . These recognized exceptions are, of course, only examples of situations where the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated, or (3) tends to show that the contract should be defeated or altered on the equitable ground that relief can be had against any deed or contract in writing founded in mistake or fraud." (Citations omitted; emphasis in original; internal quotation marks omitted.) *TIE Communications, Inc.* v. *Kopp,* 218 Conn. 281, 288–89, 589 A.2d 329 (1991).

Here, the trial court cited substantial evidence to support its finding that the closing documents constituted the complete, final and integrated expression of the parties' intention concerning the nature, priority and duration of the lien L & R provided the bank to secure repayment of the $500,000 loan. The LeFoll parties put forth no evidence that the closing documents were incomplete on their face, that there was any ambiguity in or among them, that fraud existed or a mistake

had occurred or that the subordination agreement would not materially alter their terms. "The burden is on the party attempting to prove the absence of integration. If an agreement is determined to be integrated it renders inoperative any prior inconsistent written or oral agreements. [2 Restatement (Second), Contracts § 213 (1).]" *Neiditz* v. *Housing Authority*, 43 Conn. Sup. 283, 289, 654 A.2d 812 (1994), aff'd, 231 Conn. 598, 651 A.2d 1295 (1995). Also, the trial court found that the parties had not agreed to the terms of the subrogation agreement. Finally, even if a subordination agreement had existed, it would have materially changed the terms of the closing documents and would have been irrelevant.

C

The LeFoll parties claim that the trial court improperly determined that the oral subordination agreement was barred by the statute of frauds; see General Statutes § 52-550;[17] and that § 49-31c[18] does not apply because Murphy's October 26, 1990 letter did not memorialize the oral agreement between LeFoll and Wamester. We are not persuaded.

In response to the LeFoll parties' lender liability action, the bank asserted the statute of frauds as a

[17] General Statutes § 52-550 provides in relevant part: "(a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (4) upon any agreement for the sale of real property or any interest in or concerning real property . . . ."

[18] General Statutes § 49-31c provides: "A subordination agreement which provides that a mortgage, lease or other interest in real property shall be subordinated to one or more future mortgages is not subject to the provisions of section 52-550 and is valid and binding notwithstanding that the subordination agreement does not contain any of the terms or provisions of the future mortgage or mortgages. If the subordination agreement so provides, the subordination is automatically effective at such time or times as the future mortgage or mortgages come into existence without the necessity for the subordinating party to execute any further instruments, provided the mortgage does not violate the terms of the original subordination agreement."

special defense to which the LeFoll parties responded that the oral agreement to subordinate the bank's mortgage was not barred because § 49-31c applied and that Murphy's October 26, 1990 letter was a writing signed by the bank evidencing Wamester's agreement to subordinate.

Our statute of frauds, General Statutes § 52-550, requires that every agreement or memorandum of an agreement "for the sale of real property or any interest in or concerning real property" be in writing and signed by the party to be charged in order for a civil action to be maintained against that party. Section 49-31c exempts subordination agreements from the statute of frauds even if they do not "contain any of the terms or provisions of the future mortgage or mortgages." The subordination agreement itself, however, must be in writing. The trial court found, and we agree, that Murphy's October 26, 1990 letter, reasonably construed to give meaning to all of its provisions, memorializes an agreement that is materially different from the oral agreement on which the LeFoll parties rely. To wit, LeFoll, by his November 21, 1990 letter in response to Murphy, understood the oral agreement to mean that, upon his request, the bank would unconditionally subordinate its mortgage. Murphy's October 26, 1990 letter, which was intended to memorialize an agreement reached by LeFoll and O'Brien after Wamester left the bank, requires substitute collateral to secure the bank's interest. The trial court, therefore, properly determined that the October 26, 1990 letter does not take the subordination agreement out of the statute of frauds.

The trial court properly determined that the oral subordination agreement was not enforceable.

## II

The LeFoll parties' second claim is that the trial court improperly determined that the bank could enforce its

note. The LeFoll parties claim that because the bank breached its agreement to subordinate its loan to a construction mortgage, it is barred from an equitable foreclosure action by the doctrine of unclean hands. This claim fails because the trial court found substantial evidence that there was no enforceable agreement between the parties that the bank agreed to subordinate its loan. Because there was no agreement, there could be no breach. The trial court, therefore, properly concluded that the bank's foreclosure action was not barred by the doctrine of unclean hands.

III

The LeFoll parties' third claim is that the trial judge improperly failed to recuse himself. We do not agree.

The following facts are relevant to this claim. Prior to trial during an in-chambers conference with counsel concerning pretrial motions, the trial judge advised counsel for all parties that he was a former shareholder of the bank by virtue of the bank's having acquired a smaller bank in which he held shares. The proceeds of those shares were presently held by the bank in the form of certificates of deposit. The trial judge repeated his disclosure from the bench in the presence of all trial counsel.[19] Counsel for the LeFoll parties then noted

---

[19] The trial judge said, "Before the court entertains any comments or considers acting on the matters in any way, the court wishes to indicate upon the record that mindful of the involvement here of Connecticut National Bank, which it is the court's belief is now known as Shawmut Bank . . . the court indicates that there was a point in time several years ago when Shawmut took over a bank known as Home Bank and Trust, formerly Home National Bank and Trust, which was situated in the city of Meriden, that the court was at that time a stockholder in Home Bank, and, subsequently, as a result of the takeover became a stockholder in Shawmut.

"In due course, the shares held by the court in Shawmut were liquidated. And in the main, the proceeds therefrom were placed on deposit with Shawmut in the form of a variety of certificates of deposit which condition continues to the date hereof. And, therefore, the court feels that it is appropriate and proper to disclose and make this known to counsel in order that they may express their opinion or make whatever motion or request they

LeFoll's presence for the record, told the trial court the two of them had conferred and stated on the record: "We both feel that given the disclosure you have made and the timely manner that you have made it, we discussed it, we find that there's no problems. We are aware of you as a judge. We feel that this is worth noting only for the record, and for the record only. We find no problems whatsoever, Your Honor." Counsel for the LeFoll parties confirmed their desire for the trial to proceed before the trial court at the commencement of trial.

" '[A]s a general rule, even in cases alleging judicial bias, this court will not consider the issue on appeal where the party failed to make the proper motion for disqualification at trial.' *Barca* v. *Barca*, 15 Conn. App. 604, 607, 546 A.2d 887, cert. denied, 209 Conn. 824, 552 A.2d 430 (1988). Failure to request recusal or move for a mistrial represents the [parties'] acquiescence to the judge presiding over the trial. Id.; *Timm* v. *Timm*, 195 Conn. 202, 205, 487 A.2d 191 (1985); see Practice Book § 4185 [now § 60-5]." *Schnabel* v. *Tyler*, 32 Conn. App. 704, 714, 630 A.2d 1361 (1993), aff'd, 230 Conn. 735, 646 A.2d 152 (1994). "Our Supreme Court has criticized the practice whereby an attorney, cognizant of circumstances giving rise to an objection before or during trial, waits until after an unfavorable judgment to raise the issue. 'We have made it clear that we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the trial.' *Timm* v. *Timm*, [supra, 205]." *Fiddelman* v. *Redmon*, 31 Conn. App. 201, 213, 623 A.2d 1064, cert. denied, 226 Conn. 915, 628 A.2d 986 (1993).

feel is proper on behalf of those that they represent as to the propriety of this jurist's presiding over any of these proceedings. And with that observation, I'll entertain whatever comment counsel would like to make."

Here, the LeFoll parties twice informed the trial judge that they had no objection to his presiding at trial. The parties were represented by counsel and LeFoll, who is himself an attorney, was present in the courtroom when the trial judge made his disclosure. Once they waive their right to disqualify the trial judge, the parties are bound by their waiver. See General Statutes § 51-39. The trial judge, therefore, did not improperly fail to recuse himself.

## IV

The LeFoll parties' next claim is that the trial court improperly determined that the bank was excused from subordinating its mortgage to a construction loan because L & R could not satisfy the conditions precedent to the loan commitment from Mechanics. We disagree.

The following additional facts are necessary for our analysis of this claim. Steven Zarrella, the bank officer at Mechanics in charge of L & R's mortgage application, presented a construction-permanent mortgage loan application[20] to the appropriate committee in January, 1991. The presentation contained a list of ten conditions that L & R had to fulfill before Mechanics would be obligated to close the loan. LeFoll had negotiated these ten conditions with Zarrella before the presentation. The following were among the ten conditions precedent: the bank's mortgage on the Colchester property had to be released and placed on another LeFoll property, environmental site assessments on the Colchester property and property at 2275 Silas Deane Highway[21] had to be completed and leases for 50 percent of the

---

[20] Upon completion of the project, the loan would have been converted from a construction to a permanent loan. Although Mechanics would have considered making a simple construction mortgage loan to L & R, LeFoll never applied for this type of loan.

[21] LeFoll owned the Silas Deane Highway property.

space in the improvements on the Colchester property had to be approved by Mechanics.

On March 25, 1991, Mechanics issued a formal commitment to make a construction-permanent loan of up to $1,000,000 to L & R. LeFoll accepted the commitment by paying Mechanics $5000, which was half of the commitment fee to which Mechanics was entitled. When it was issued, the Mechanics commitment contained the ten preconditions contained in Zarrella's presentation. Two more of those conditions of note were Mechanics' receiving a title insurance policy insuring Mechanics' mortgage as the first lien on the Colchester property subject only to such exceptions to title as Mechanics approved and an opinion letter from counsel that there was no outstanding or threatened litigation, administrative or other proceedings, the outcome of which could materially and adversely affect L & R.

According to Zarrella's testimony, Mechanics would not have been obligated to close on the L & R mortgage if, at the time of the closing, the bank was claiming that L & R had defaulted under the note or if the bank was threatening to foreclose on the Colchester property. In addition, according to Zarrella, if the bank had subordinated its mortgage on the Colchester property, Mechanics would not have approved the second lien of that mortgage as an exception to the title and would not have been obligated to close the construction-permanent loan unless the bank's mortgage was first released. Without a release of the bank's mortgage on the Colchester property, Mechanics might have closed the construction-permanent loan *only* if the bank would first subordinate the mortgage *and also* entered into a standstill agreement by which the bank would agree not to foreclose or take any action against L & R for some period of time. The Mechanics loan was to be used for construction purposes only and it was not intended to pay off the bank's note.

In April, 1991, L & R failed to pay interest for March, 1991, due the bank under the note. LeFoll attempted to justify his failure to pay the interest due as an appropriate response to the bank's refusal to subordinate in April, 1991, as an anticipatory breach. On May 17, 1991, the bank issued default notices and made demands on L & R, as maker of the note, and LeFoll and his wife, as guarantors, for payment of the entire principal and accrued interest under the note.

LeFoll did not present the bank with a subordination instrument and the bank did not fail or refuse to sign a subordination instrument. As of the middle of April, 1991, LeFoll testified, his proposed development of the Colchester property was aborted. The trial court found, however, overwhelming evidence to the contrary as LeFoll continued to work on the project.

There was no closing under the Mechanics' commitment for the construction-permanent loan. The trial court found by a preponderance of the evidence that the reasons that Mechanics would not close were not that the bank would not subordinate its mortgage, but that the bank would not subordinate *and* agree to a satisfactory standstill agreement that would require an extension of the maturity of the note and that L & R had not satisfied other conditions of the Mechanics commitment, including the conditions relating to pre-leasing and delivery of environmental impact assessments.

LeFoll was not going to pay the bank the $500,000 due under the note because, in his view, the bank had breached an agreement to subordinate and the four months from April to August, 1991, was insufficient time to refinance or otherwise raise the funds to pay off the bank mortgage. He decided to do nothing further to obtain a loan from Mechanics and, instead, to seek redress from the bank through the present lawsuit.

On the basis of those facts, the trial court found that the LeFoll parties failed to satisfy their burden of proving that L & R would have obtained a construction-permanent mortgage but for its inability to obtain a subordination document from the bank. The subordinate facts clearly support the trial court's finding because L & R did not meet all of the preconditions of Mechanics' commitment. According to Zarrella, Mechanics was not willing to accept a mere subordination of the bank's lien. There is no evidence, therefore, to support the LeFoll parties' position that the bank's failure to subordinate was the cause of their failure to secure construction financing.

V

The LeFoll parties claim, with respect to the foreclosure action, that the trial court lacked jurisdiction to set law days after this court dismissed their first appeal. See *Connecticut National Bank* v. *L & R Realty*, 40 Conn. App. 492, 671 A.2d 1315 (1996). We do not agree.

The following facts are necessary for our resolution of this issue. Following the trial, the court rendered judgments in favor of the bank in both actions, ordering a strict foreclosure of the mortgage, determining the amount of debt and awarding attorney's fees and an appraisal fee. The LeFoll parties appealed and the bank moved the trial court to set law days, which motion was denied due to the automatic stay provision of our rules of practice. We determined that without the setting of law days, the judgment of strict foreclosure was not a final judgment because the parties' rights had not yet been concluded. Id., 493–94. We, therefore, dismissed the LeFoll parties' appeal. Id., 494. The bank again moved the trial court to set law days and the LeFoll parties objected claiming that the trial court was without jurisdiction to open the judgment and that a new trial was required. The LeFoll parties based their

argument on General Statutes §§ 52-212a and 51-183b. The trial court concluded, however, that General Statutes § 49-15 authorized the opening of the judgment of strict foreclosure for the purpose of setting law days. Following the setting of law days, the LeFoll parties appealed.

The LeFoll parties argue that because this court held that although the trial court rendered a judgment of strict foreclosure on June 20, 1995, "[w]ithout the setting of law days, the time for redemption has not been limited and the parties' rights remain unconcluded as to that issue. As a result, a strict foreclosure judgment that is silent as to law days cannot be final for the purpose of appeal." *Connecticut National Bank* v. *L & R Realty*, supra, 40 Conn. App. 494. The LeFoll parties, therefore, conclude that judgment was not rendered as required by § 51-183b.[22] The LeFoll parties fail to distinguish a judgment of strict foreclosure and a final judgment for the purposes of an appeal. Although the trial court's judgment was not final for purposes of an appeal, it fulfilled the trial court's statutory obligation to render a judgment within 120 days after the conclusion of the trial.

Even if the trial court's judgment had included the setting of law days and, therefore, been free of any technical defect, once an appeal is taken, a stay is automatically imposed on the foreclosure action. See Practice Book § 61-11. Whether the appeal is dismissed or remanded to the trial court, the trial court will necessarily have to set new law days. "One of the distinguishing features of a defendant's appeal from a judgment of strict foreclosure is that a remand to the trial court is

[22] General Statutes § 51-183b provides in relevant part: "Any judge of the Superior Court . . . who has commenced the trial of any civil cause, shall have power to continue such trial and shall render judgment not later than one hundred and twenty days from the completion date of the trial of such civil cause. . . ."

almost always required, even if the appeal resulted in a finding of no error in the entry of the original judgment. Since the taking of an appeal stays the passing of the law days, once the appeal is concluded the trial court must once again act on the case and set new law days." D. Caron, Connecticut Foreclosures (2d Ed. 1989) § 17.03.

Section 49-15 provides: "Any judgment foreclosing the title to real estate by strict foreclosure may, at the discretion of the court rendering the same, upon the written motion of any person having an interest therein, and for cause shown, be opened and modified, notwithstanding the limitation imposed by section 52-212a, upon such terms as to costs as the court deems reasonable; but no such judgment shall be opened after the title has become absolute in any encumbrancer."[23] After this court dismissed the LeFoll parties' first appeal for want of a final judgment, the action naturally returned to the trial court where the bank appropriately moved the court to set law days. The trial court had jurisdiction over the matter and properly set law days pursuant to § 49-15.

## VI

The LeFoll parties' next claim is that the trial court improperly found sufficient evidence to support the foreclosure judgment. They argue, relying on General Statutes § 42a-3-309, that because the bank did not present the original note, it did not prove that it was a holder in due course and, therefore, the bank is not entitled to enforce the note. We are not persuaded.

The action before the trial court was a foreclosure action on a mortgage. Our Supreme Court has held that a judgment of strict foreclosure of a mortgage is

---

[23] In support of their claim, the LeFoll parties cite *Morici* v. *Jarvie*, 137 Conn. 97, 75 A.2d 47 (1950). *Morici* is not only distinguishable on its facts, but also, it was legislatively overruled by § 49-15.

separate and distinct from an action on the underlying note. See *New England Savings Bank* v. *Bedford Realty Corp.*, 238 Conn. 745, 759–60, 680 A.2d 301 (1996). "It is well established [however] that the [mortgagee] is entitled to pursue its remedy at law on the notes, or to pursue its remedy in equity upon the mortgage, or to pursue both. A note and a mortgage given to secure it are separate instruments, executed for different purposes and in this State action for foreclosure of the mortgage and upon the note are regarded and treated, in practice, as separate and distinct causes of action, although both may be pursued in a foreclosure suit. . . . *Hartford National Bank & Trust Co.* v. *Kotkin*, 185 Conn. 579, 581, 441 A.2d 593 (1981); see also *First Bank* v. *Simpson*, 199 Conn. 368, 372, 507 A.2d 997 (1986)." (Internal quotation marks omitted.) *New England Savings Bank* v. *Bedford Realty Corp.*, supra, 759.

The trial court, therefore, had sufficient evidence before it to render a judgment of strict foreclosure on the mortgage.

## VII

The LeFoll parties also claim that the trial court improperly determined that they failed to mitigate their damages. Because we conclude that the trial court properly determined that the LeFoll parties did not suffer damages, it is not necessary to address this issue.

## VIII

The LeFoll parties' final claim is that the trial court improperly awarded the bank attorney's fees. We disagree.

Both the mortgage and the note contain provisions for awarding attorney's fees to enforce the lien or in any litigation arising from the note. Ordinarily, a successful litigant is not entitled to an award of attorney's fees. See *Rizzo Pool Co.* v. *Del Grosso*, 240 Conn. 58, 72, 689

A.2d 1097 (1997). This rule is known as the "American rule." See 20 Am. Jr. 2d, Costs § 57. "Connecticut adheres to the American rule. See, e.g., *Brookfield* v. *Candlewood Shores Estates, Inc.*, 201 Conn. 1, 14, 513 A.2d 1218 (1986); *Gino's Pizza of East Hartford, Inc.* v. *Kaplan*, 193 Conn. 135, 140, 475 A.2d 305 (1984); *Gionfriddo* v. *Avis Rent A Car System, Inc.*, 192 Conn. 280, 297, 472 A.2d 306 (1984); *Litton Industries Credit Corporation* v. *Catanuto*, 175 Conn. 69, [76], 394 A.2d 191 (1978). . . ." (Citations omitted.) *Rizzo Pool Co.* v. *Del Grosso*, supra, 72–73. Connecticut recognizes, however, the exceptions to this rule. A successful litigant is entitled to an award of attorney's fees, however, if they are provided by contract; see *Storm Associates, Inc.* v. *Baumgold*, 186 Conn. 237, 245, 440 A.2d 306 (1982); by statute; see, e.g., General Statutes § 52-251a (attorney's fees awarded on small claims matter transferred to regular docket); or as an aspect of punitive damages. See *Bodner* v. *United States Automobile Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992). In the case before us, the trial court properly awarded attorney's fees pursuant to the agreement between the parties as evidenced by the mortgage and the note.

The judgment is affirmed and the case is remanded for the purpose of setting new law days.

In this opinion the other judges concurred.

